CITY OF SANTA CLARA,
CALIFORNIA, Plaintiff,

v.

Thomas KLEPPE, Individually and as Secretary of the Interior, and Gilbert Stamm, Individually and as Commissioner of the Bureau of Reclamation, United States Department of the Interior, Defendants,

Pacific Gas & Electric Co.,
Intervenor-Defendant.

No. C–75–1574.

United States District Court,
N. D. California.

July 23, 1976.

Edwin J. Moore, City Atty., Santa Clara, Cal., M. Van Smith, Asst. City Atty., Palo Alto, Cal., Michael R. Downey, Deputy City Atty., Santa Clara, Cal., and Frederick D. Palmer, of Duncan, Brown, Weinberg & Palmer, Washington, D. C., for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C., James L. Browning, Jr., U. S. Atty., Richard F. Locke, Asst. U. S. Atty., N. D. Cal., San Francisco, Cal., Stanley D. Rose, C. Max Vassanelli, Attys., Dept. of Justice, Washington, D. C., for federal defendants.

Morris M. Doyle, Terry J. Houlihan, Phyllis Kay Dryden, Charles A. Ferguson-Lawrence, of McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., and John C. Morrissey, Malcolm H. Furbush, Theodore L. Lindberg, of Pacific Gas and Elec. Co., San Francisco, Cal., for intervenor-defendant PG&E.

## DECISION

CONTI, District Judge.

This case brings for judicial resolution a controversy over low cost federal hydroelectric power emanating from the Bureau of Reclamation's California Central Valley Project (CVP). The principal parties are the California City of Santa Clara on one side and the U. S. Department of the Interior and its Bureau of Reclamation on the other. Pacific Gas & Electric, a private utility company, has intervened as party defendant. Simply stated, Santa Clara wants more low cost federal power than the federal defendants have allocated to it, and suggests that the Bureau's allocation scheme is legally defective. The Bureau responds that how it allocates the CVP power under its control is unreviewably discretionary, but, for that matter, the allocation scheme was fairly formulated and is rationally based. PG&E, long an integral part of the Bureau's power allocation plan, and the source to which Santa Clara would most likely have to look for satisfaction of its power needs if the court upholds the Bureau's scheme, supports the Bureau's position. Santa Clara would prefer to purchase CVP power at $.005 per kilowatt-hour

rather than PG&E power at $.019 per kilowatt-hour.[1]

### I. *Project Authority and Background.*

CVP is a multipurpose project consisting of numerous dams, hydroelectric power generation and transmission facilities and irrigation canals, located in the Central Valley of California and the surrounding mountains.[2] Although the production of hydro-generated power is not the primary purpose of the Project, the amount of electricity generated is substantial and serves a large number of customers in northern and central California.[3]

The Central Valley Project Authorization Act, 50 Stat. 850, provides in part:

Sec. 2. . . . The entire Central Valley project, California, heretofore authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935 (49 Stat. 115) and the First Deficiency Appropriation Act, fiscal year 1936 (49 Stat. 1622), is hereby reauthorized and declared to be for the purposes of improving navigation, regulating the flow of the San Joaquin River and the Sacramento River, controlling floods, providing for storage and for the delivery of the stored waters thereof, for the reclamation of arid and semiarid lands and lands of Indian reservations, and other beneficial uses, and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes: *Provided further,* That, except as herein otherwise specifically provided, the provisions of the reclamation law, as amended, shall govern the repayment of expenditures and the construction, operation, and maintenance of the dams, canals, power plants, pumping plans, transmission lines, and incidental works deemed necessary to said entire project, and the Secretary of the Interior may enter into repayment contracts, and other necessary contracts, with State agencies, authorities, associations, persons, and corporations, either public or private, including all agencies with which contracts are authorized under the reclamation law, . . . . : *And provided further,* That the said dam and reservoirs shall be used first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and third, for power. See also, Central Valley Project Reauthorization Act, 16 U.S.C. § 695d.

Thus incorporated into the Central Valley Project Authorization Act is the following provision of the Reclamation Project Act of 1939, found in Section 9(c), 43 U.S.C. § 485h(c):

Any sale of electric power or lease of power privileges, made by the Secretary in connection with the operation of any project or division of a project, shall be for such periods, not to exceed forty years, and at such rates as in his judgment will produce power revenues at least sufficient to cover an appropriate share of the construction investment at not less than 3 per centum per annum, and such other fixed charges as the Secretary deems proper: *Provided further,* That in said sales or leases preference shall be given to municipalities and other public corporations or agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural

---

1. See Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Doc.No.16, at page 5, n. 1.

2. The Project is described in fine detail in *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

3. At the time the complaint in this action was filed, the direct customers of the CVP were five municipal corporations in addition to Santa Clara (Roseville, Palo Alto, Redding, Biggs and Gridley); one public utility district (Shasta Dam Area Public Utility District); six federal agencies; five state agencies; one rural electric cooperative (Plumas Sierra Cooperative); and PG&E. The number of ultimate consumer-customers receiving power from these direct customers is in the hundreds of thousands. See Defendants' Motion for Summary Judgment, Doc.No. 15, at page 5, n. 2.

Electrification Act of 1936 [and any amendments thereof]. . . .

\* \* \* \* \* \*

No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes.

.There is no question, and no argument to the contrary, that the "preference clause" of Section 9(c) applies to sales of federally-generated hydroelectric power from CVP, see *Arizona Power Pooling Assn. v. Morton*, 527 F.2d 721 (9th Cir. 1975), nor does the government dispute that Santa Clara is entitled to preference in the sale of the CVP power. Rather, the controversy centers around the Bureau's allocation decision which treats other preference customers more favorably than Santa Clara in the fierce competition for limited low cost federal CVP power.

Santa Clara has received varying amounts of CVP power since 1965. The City had lodged many requests for power with the Bureau, beginning in 1960, but its early requests acknowledged that it could not provide a market for federal power until late 1967, at which time its then existing power requirements contract with PG&E, which had been supplying all the City's power needs, would expire. Wishing to insure a supply of federal power at the earliest opportunity, however, the City sought a prospective allocation to satisfy its future, post-1967, needs.[4] The Bureau responded that it could not then commit itself to such a future allocation, in view of anticipated Project requirements, but that the City's application would be kept on file for consideration nearer the time Santa Clara could actually purchase power, free from the PG&E contract.[5]

Meanwhile, early in 1963 additional hydroelectric power became available to the CVP with the coming on line of power from the Trinity River Division of the CVP.[6] More energy became available as the generating units of that division proceeded to completion in May of 1964. While a notice of this additional power was sent to all entities entitled to preference status, including Santa Clara,[7] requesting estimates of present load requirements and future load growth, this additional power was allocated to then existing preference customers only, excluding Santa Clara, because of the City's inability to take power immediately.[8]

Concerned that all CVP power was fast becoming spoken for, and dissatisfied with the Bureau's repeated assurances that the City's application would receive due consideration, the City, in July, 1964, telegraphed the Secretary of the Interior directly, requesting an immediate allocation of CVP power, on a withdrawable basis if absolutely necessary. The City asserted that its contract with PG&E was not binding on it and should not bar its eligibility to receive CVP power. The Secretary responded that 75 megawatts of power could be offered if the City could make arrangements with PG&E for its transmission. The letter warned, however, that the power would be withdrawn when required to meet previously promised, long-term firm allocations to other preference customers.[9] The City thereupon submitted a formal application for that amount, but again requested that it be kept in mind for a firm, non-withdrawable allocation when and if additional power became available, and set forth its predicted power needs through 1980.[10]

PG&E objected to the Department's offering power to Santa Clara while the utility's requirements contract with the City was still outstanding. The Secretary of the Interior concluded, however, that the De-

---

**4.** See Plaintiff's Exhibits 2 and 4.

**5.** See Defendants' Exhibit 3.

**6.** .See Plaintiff's Exhibit 3.

**7.** See Plaintiff's Exhibit 3.

**8.** See Defendants' Motion for Summary Judgment, Doc.No.15, at page 7.

**9.** See Plaintiff's Exhibit 9.

**10.** See Plaintiff's Exhibit 10.

partment had to recognize its statutory responsibilities in the marketing of federal power to preference customers, including Santa Clara, and that the fact of a dispute between the City and PG&E over the validity of their power requirements contract would not relieve the Department of its statutory duty to provide available service to Santa Clara.[11]

On November 30, 1965, Santa Clara and the Bureau finally contracted for the purchase of CVP power on a withdrawable basis.[12] Santa Clara's allotment under the original contract was 75,000 kilowatts, but was revised upward several times by amendments until it reached a peak of 120,000 kilowatts in November, 1970. All these increases had the City's assent. In 1971, however, the Bureau began to withdraw power from the City, by contract amendments which were not consented to, such that by July, 1974, the maximum kilowat-

tage receivable was 71,450. Subsequent withdrawals will most probably take place,[13] and it is alleged that in the not too distant future, the power and associated energy available for purchase by Santa Clara from the federal CVP source will drop to zero. At times when the City's requirements could not be met from federal power sources, Santa Clara has had to purchase the difference from PG&E pursuant to an existing contract.

During the period Santa Clara was receiving withdrawable power, it reiterated its request for a non-withdrawable allocation. As additional power became available, however, the Bureau decided to hold most, if not all, of it for preference customers already receiving a non-withdrawable allocation, so as to meet their load growth needs, rather than to offer this power to existing customers with withdrawable allocations, such as Santa Clara, on a non-withdrawable basis.[14]

---

11. See Plaintiff's Exhibit 12. The Secretary's decision was based in part on advice requested and received from the U. S. Solicitor's office to the effect that the statute unequivocally mandated offering available power to preference customers, and that the Department could not legally be involved in the contract dispute between Santa Clara and PG&E. See Plaintiff's Exhibit 13.

12. See Defendants' Exhibit 7.

13. See Plaintiff's Exhibit 24, which indicates that as of May 1, 1976, there was an anticipated withdrawal from Santa Clara of an additional 24,200 kilowatts.

14. See Plaintiff's Exhibits 17, 20, 21, and 22, and Defendants' Exhibits 11, 12, and 13.
For example, on March 22, 1966, the Bureau agreed to sell to the Sacramento Municipal Utility District up to 70,000 kilowatts of power in addition to the District's then contract rate of delivery of 290,000 kilowatts. Between the contract execution date and April 1, 1973, the District could receive as much as 70,000 kilowatts in addition to its then allotment by requesting such in writing. After April 1, 1973, the contract rate of delivery to the District was set at 360,000 kilowatts. This new allocation to the District was not subject to withdrawal to meet the demands of other preference customers, as was the allocation of power made to Santa Clara in 1965. See Plaintiff's Exhibit 16, Letter Agreement between Sacramento Municipal Utility District and the Bureau, at par. 4 and 5. A similar contract was entered into in

December, 1966, with Westlands Water District. See Plaintiff's Exhibit 23.
Again, on August 22, 1967, the Bureau agreed to sell to the City of Palo Alto, California, an additional 21,000 kilowatts of firm power over its then contract rate of delivery of 79,000 kilowatts. Further, the City of Palo Alto was promised its total future load growth requirements through 1980, with the proviso that if total firm load of all preference agencies exceeded the Project output, as preference agency required load increased in subsequent years, a pro rata allocation would be made, based on the ratio of city load to total load. See Art. 7 of Contract between Palo Alto and Bureau, Plaintiff's Exhibit 18. See also original Bureau-Palo Alto Contract, Plaintiff's Exhibit 8. Contrast the language found in Article 7 of the revised Palo Alto-Bureau contract, Plaintiff's Exhibit 18, with the language found in Article 9 of the Santa Clara-Bureau contract, Plaintiff's Exhibit 14. The latter contract states, in pertinent part:

> Provided, That power and energy deliveries made under the terms of this agreement are deemed to be power and energy temporarily available from unused allocated firm Central Valley Project power and is also power and energy available within the project dependable capacity for preference agency use. Therefore, power and energy deliveries as contemplated herein will be withdrawn upon 30 days written notice to [Santa Clara], to any extent necessary to limit the total preference agency power demand to an amount within the project dependable capacity of the Central Valley Project. Withdrawal of pow-

It is this discrimination against Santa Clara, a preference customer with only a short term, withdrawable allocation, in favor of other similarly situated [15] preference customers, who not only originally received a long-term, non-withdrawable allocation but who also were afforded additional non-withdrawable power as it became available, of which the City primarily complains here. Santa Clara alleges that the Bureau's creation of this class of what the City terms "super-preference customers" contravenes governing legal principles. The defendants do not dispute that such discrimination between preference customers has been practised; [16] rather, it is their position that it is

er and energy up to a total amount equal to the contract rate of delivery specified herein shall constitute termination of this agreement.

The effect of this language vis-à-vis the language found in Bureau contracts with other preference agencies with *non*-withdrawable allocations, such as Palo Alto, is to provide for withdrawals of power from Santa Clara and other customers with withdrawable allocations, when such power is necessary to meet load growths of preference customers with non-withdrawable allocations, within project dependable capacity. Thus, once project dependable capacity is reached due to load growths of these customers, which the Bureau has contracted to satisfy, Santa Clara's allocation will have been completely withdrawn, and its contract with the Bureau will be considered terminated. It is only at this point—when project dependable capacity is reached—that the customers with non-withdrawable allocations will have to suffer a limitation on power to meet load growth, according to the pro rata scheme in their contracts. See Defendants' Exhibit 13. The effect of this difference in contract language is, of course, to treat Santa Clara substantially differently from other preference customers in terms of the CVP power it can receive.

Preference customers with contracts providing for a long-term, non-withdrawable allocation of firm power, like Palo Alto's, include the California cities of Biggs, Gridley, Redding, and Roseville, the Plumas-Sierra Rural Electric Cooperative, and the Shasta Dam Public Utilities District, as well as the Sacramento Municipal Utility District and the Westlands Water District noted above.

Preference customers with contracts providing for a short-term, withdrawable allocation of power, like Santa Clara's, include Stanford Linear Accelerator Center, A.E.C. Livermore, A.E.C. Sandia, Beale Air Force Base, DeWitt Hospital, State of California, Grapevine Power Plant, State of California, Mather Air Force Base, Mather Wherry Housing, Mare Island Naval Shipyard, NAS LeMoore, NAS Moffett, Naval Communications Station Stockton, Naval Radio Station, Dixon, Naval Weapons Station, Concord, Northern California Youth Center, University of California at Davis, and U.S. I.A., Voice of America. As of May 1, 1971, Santa Clara's share of this short term, withdrawable power constituted roughly two-thirds of the total CVP power marketed in this man-

ner. See Defendants' Exhibit 16, particularly the attachment to the Bureau's letter showing anticipated withdrawals from each such customer. Santa Clara is the only major municipality on the list of preference customers with short-term, withdrawable allocations of CVP power. Thus, as far as the record shows, all other municipal users of CVP power fall into the category of preference customers receiving a long-term, non-withdrawable allocation. See also Defendants' Submission of CVP Data, Doc.No.23, which shows kilowatt and kilowatt-hour usage for each CVP customer for 1960–1975. The 1975 consumption figures for *municipal users* are shown in that submission to be as follows:

| Municipal Customer | Kilowatts |
|---|---|
| City of Biggs | 2,440 |
| City of Gridley | 5,967 |
| City of Palo Alto | 139,793 |
| City of Redding | 52,980 |
| City of Roseville | 36,520 |
| City of Santa Clara | 73,800 |
| Sacramento Municipal Utility Dist. | 360,000 |
| Shasta Dam Public Utilities Dist. | 4,186 |
| Plumas-Sierra Rural Elec. Coop. | 10,220 |

Even assuming that Santa Clara's actual utilization of power is presently somewhat in excess of 120,000 kilowatts (the maximum it received from CVP in 1971), the above figures show that the City's power usage is neither significantly greater nor significantly lesser than the usage of other municipal preference customers, who have long-term, non-withdrawable allocations, and the difference in treatment of Santa Clara cannot be attributed to any such factor.

When withdrawals from short-term allocation customers have become necessary, apparently the Bureau has calculated the amount of such withdrawals per customer on some sort of pro rata basis. For example, for the withdrawals anticipated during the summer months of 1971, see Defendants' Exhibit 16, attachment.

15. "Similarly situated" in the sense of being a municipal user with load demands roughly equivalent to other municipal users of CVP power.

16. See Defendants' Motion for Summary Judgment, Doc.No.15, at pages 6–9, 10.

within the unreviewable discretion granted them by Congress to so discriminate. Alternatively, they assert that the discriminatory aspects of the allocation scheme are rationally based.

## II. *Specific Legal Claims.*

Santa Clara marshals the following legal arguments in support of its claims:

(1) It contends that the federal government has transgressed the commands of the Federal Reclamation Laws, 43 U.S.C. § 371 et seq. (a) by selling power to PG&E, a private entity not entitled to the statutory preference contained in 43 U.S.C. § 485h(c), and (b) by discriminating against one preference customer, Santa Clara, in favor of other preference customers;

(2) It says that if not the statute, then the Fifth Amendment, with its equal protection concepts of due process, bars such discrimination;

(3) The City claims a denial of the procedural due process protected by the Administrative Procedure Act, 5 U.S.C. § 551 et seq., in the federal defendants' failure to establish, by regulation or otherwise, without opportunity for input by interested parties, any standards or guidelines by which is regulated the method of CVP power allocation among preference customers;

(4) It likewise claims that whatever procedures that might have been followed by the Bureau in determining allocations and types of allocations were so deficient as to deny due process; and, finally,

(5) Santa Clara maintains that defendants' actions violate the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.

The Department and the Bureau, and PG&E, in addition to maintaining that their allocation scheme is unreviewable or in any event rational, respond first, that this is an unconsented suit against the sovereign and is, therefore, barred; second, that Congress has approved the Bureau's allocation scheme; third, that the provisions of the Administrative Procedure Act, 5 U.S.C. § 551 et seq., cited by plaintiff are either

inapplicable or were satisfied; fourth, that the City has no property interest entitled to due process protection; and fifth, that NEPA does not apply.

We now have before us (1) federal defendants' motion, joined in by PG&E, for summary judgment on all due process issues and alleged violations of the Federal Reclamation Laws; (2) defendants' motion for summary judgment on the NEPA claim; (3) plaintiff's motion for summary judgment on the due process issues; and (4) PG&E's motion for summary judgment on its counterclaim against Santa Clara for monies due under its power sale contract. For reasons hereinafter stated, the court denies (1), (3), and (4), and grants (2).

## A. *Sovereign Immunity.*

■ The threshold jurisdictional question raised interestingly enough in the first instance by PG&E and not the sovereign's officers, of whether this suit is barred by the doctrine of sovereign immunity, must logically be entertained first. While the law of the subject in some respects is confusing, *Land v. Dollar*, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), the inapplicability of the doctrine to this case is relatively clear. Since *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it has been established that sovereign immunity is no defense in suits against officers who allegedly act unconstitutionally or in excess of authority. *Georgia R. R. & Banking Co. v. Redwine*, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912); *Ickes v. Fox*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937); *United States v. Lee*, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882). This case presents just such allegations. PG&E's cases, *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Malone v. Bowdoin*, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); *Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); and *City of Fresno v. California*, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963), while

presenting some fascinating questions regarding the future course of the law of the doctrine as it applies in suits against officers who act *within* valid authority, are not to the contrary. See generally 3 Davis, *Administrative Law Treatise*, §§ 27.03–27.-05; and 1970 Supp. § 27.01.

■ Since we hold that under established law, the doctrine of sovereign immunity does not bar this action, we need not consider the possibility that the Administrative Procedure Act operates as a partial waiver of sovereign immunity, which question is in a state of considerable confusion. Compare *Adams v. Witmer*, 271 F.2d 29 (9th Cir. 1958) (APA authorized suit against officer; sovereign immunity not discussed), with *State of Washington v. Udall*, 417 F.2d 1310 (9th Cir. 1969) (court avoided sovereign immunity by holding that the Secretary exceeded his authority); *Scanwell Laboratories v. Shaffer*, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970) (APA waives sovereign immunity); *Kletschka v. Driver*, 411 F.2d 436 (2d Cir. 1969) (APA waives sovereign immunity concerning those claims which come within its scope).

### B. *Violation of Federal Reclamation Laws.*

#### (1) *Preference Clause Issue.*

Plaintiff notes that substantial amounts of CVP power have been sold to PG&E over the years [17] and maintains that had this power been allocated to preference customers, as the statute requires, there would be no controversy since all of Santa Clara's requirements for power would be met.

There is no dispute as to the basic facts: the preference clause clearly applies, and PG&E is not a preference customer.

There is, however, some dispute as to whether this power has actually been unconditionally "sold" to PG&E in the standard sense. If so, the statute has been violated. PG&E and the Bureau maintain that while power *is* sold to PG&E, it is subject to the Bureau's right to repurchase an equivalent amount of energy at a later date for delivery to preference customers.

■ This is indeed the case. The contract between the Bureau and PG&E [18] provides that capacity and energy sold to PG&E must be recorded in special capacity and energy accounts and is subject to Bureau repurchase rights. See Contract 2948A, Article 20(a, b, c, & e) and Article 21. In essence, energy is "banked" by PG&E for future Bureau use. The bank account provisions of the contract were included to enable the Secretary of the Interior to carry out a power marketing plan developed in 1964 to meet the long-term needs of preference customers.[19] The withdrawals of power from Santa Clara beginning in 1971 were made as a part of this plan.[20] In order for the Bureau to satisfy load growth of the then existing preference customers through 1980 (the time targeted in the 1964 marketing scheme), and at the same time have power available for anticipated Bureau loads coming on line (such as the San Luis pumping unit scheduled for 1966–67), it was necessary to make provision in the scheme for some sort of power banking arrangement, and the Bureau—PG&E contract does just that. Hence, the court finds that the "sales" of power to

---

17. See Defendants' Submission of CVP Data, Doc.No.23. Since 1965, PG&E has purchased in excess of 80,000 kilowatts annually; the 1975 allocation to the utility was 337,000 kilowatts.

18. The PG&E-Bureau contract (Contract 2948A) is attached as Appendix C to Supplemental Memorandum of PG&E in Support of Defendants' Motion for Summary Judgment, Doc.No.27.

19. The bank accounts and the Secretary's marketing plan are discussed in Defendants' Exhibit 23, "Report to the Appropriations Committees of the Congress of the United States Recommending a Plan of Construction and Ownership of EHV Electric Interties Between the Pacific Northwest and the Pacific Southwest" (Committee Print, 1964) at pp. 21, 35–37, 39, and 43–46. The discussion at pages 35, and 43–46, describes the role of the bank accounts in the power marketing scheme.

20. See Plaintiff's Exhibit 22, at pages 1–2.

PG&E do not violate the preference provisions of 43 U.S.C. § 485h(c).[21]

### (2) Discrimination in Treatment of Preference Customers.

The relevant provisions of the Central Valley Authorization Act and the Federal Reclamation Laws are set out above. For purposes of this section, the operative provision is that found in 43 U.S.C. § 485h(c) which mandates that in the sales of CVP power, "preference shall be given to municipalities." Santa Clara argues that this language should be read to mean that all preference entities shall be treated equally in the allocation of CVP power.

### (a) Reviewability of Defendants' Actions.

The defendants and PG&E argue strenuously that the federal statutes governing the sale of CVP power to preference customers represent such a broad grant of discretion in the Secretary of the Interior that his actions thereunder are not subject to judicial review. They rely on the Administrative Procedure Act, 5 U.S.C. § 701(a)(2) which makes that Act, with its provision for judicial review of agency action under Section 702, inapplicable "to the extent that . . . agency action is committed to agency discretion by law."

■ Judicial reviewability of administrative action is the rule, and nonreviewability an exception which must be demonstrated, and which should result only from a showing of "clear and convincing evidence" of a legislative intent to restrict judicial review. *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Arizona Power Pooling Assn. v. Morton*, 527 F.2d 721 (9th Cir.

1975). See also H.R.Rep.No.1980, 79th Cong., 2d Sess., 41.

■ As the Supreme Court has stated, the "committed to agency discretion" exception is a very narrow one, applicable only in "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

■ Searching for law to apply, Santa Clara makes alternative contentions. First, the City says that the preference clause itself, mandating as it does that "preference *shall* be given" to municipalities, places limits on the Secretary's discretion sufficient to say that the agency action is not so far committed to agency discretion that judicial review is barred. This argument, like so many in cases seeking to invoke Section 701, ignores the qualifying language found there: "*to the extent* that . . . agency action is committed to agency discretion by law." Looking for shackles on discretion in the abstract is of no aid; rather, there must appear circumscription of discretion on the *particular issue* sought to be challenged. While the Secretary cannot, under the statutory mandate, sell power to a nonpreference customer over a preference customer, see *Arizona Power Pooling Assn. v. Morton*, supra, the statutory admonition does not address the question of whether the Secretary can, for example, sell *all* available power to one preference customer while refusing to sell *any* to another preference customer. Since on this particular issue 43 U.S.C. § 485h(c) does not speak, theoretically, judicial review of such a decision, no matter how arbitrary or capricious, is barred under the Administrative Procedure Act.

---

**21.** While there is no legitimate preference clause issue in this case, Santa Clara's objection to the sales to PG&E is one aspect of its larger challenge to the marketing scheme in general, under which preference entities which were Bureau CVP customers in 1964, when the plan was devised, were promised not only nonwithdrawable present allocations of CVP power, but also allocations for load growth through 1980. The sales to PG&E, and the banking of

such power by that company, were for the purpose of reserving power for the existing preference customers' load growth. As such, Santa Clara would claim, these sales are just one more example of discrimination between preference customers, because they are for the purpose of satisfying the power needs of a group of preference customers of which Santa Clara was not allowed to become a part.

Looking beyond the confines of the Reclamation Laws, however, Santa Clara finds in Section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s, the following:

Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles. . . .

It is admitted by the City that the power generated from CVP is not statutorily controlled by the Flood Control Act. Rather, Santa Clara notes that the Department and the Bureau themselves, and their attorneys here, as a matter of departmental policy consider the provisions of that Act to be applicable to the marketing of CVP power.[22] See Northern Calif. Power Agency v. Morton, 396 F.Supp. 1187, 1189 (D.D.C. 1975), aff'd per curiam without written opinion," 539 F.2d 243 (D.C.Cir. 1976) (assumed by the court to be the case.)

While the Department's interpretation of the interrelationship between the two Acts is not binding, it is the opinion of the court that at least as far as power marketing is concerned, Congress likely did intend that CVP power was to be disposed of "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." The court notes that the subject provisions of the Flood Control Act, drafted in language of general applicability to sales of public power, came just after the Reclamation Laws, and thus represent the most recent, but at the same time contemporaneous expression of Congressional desire concerning the marketing of public power. Of greater moment, there

---

22. The Department's position in this regard is found in a letter from then Secretary Udall to Representative Aspinall dated May 15, 1965:
 The provisions relating to power marketing and power rates in section 9(c) of the Reclamation Project Act of 1939 [43 U.S.C. § 485h(c)], section 5 of the Flood Control Act of 1944, and section 6 of the Bonneville Power Act are in pari materia, and each may be examined to shed light on the Congressional intent with respect to the others. Indeed, as a practical matter, as illustrated by the Bonneville Power Administration, because a single system may be used to market power from three different sources, the three statutes have to be read together and interpreted as establishing identical criteria for power rates. Consequently, the mandate of the Flood Control Act of 1944 to market power from Army projects "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles" applies also to power marketed from reclamation projects under reclamation law.
 See Federal Reclamation and Related Laws Annotated, Vol. I, at 649 (1972). See also 41 Op.Atty.Gen. 236 (1955).
 PG&E hastens to point out that this statement of Departmental policy, which is in the utility's view "unduly solicitous of Santa Clara's interests", see PG&E's Memo.Add.Pts. & Auth. in Support of Defendants' Motion for Summary Judgment, Doc.No.24, is merely an interpretation of the Reclamation Laws by the Department of the Interior, and, as such, is not binding on the Department or the court. Wilbur v. United States , 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (1930). PG&E attempts to show that Congress would not have wanted this aspect of the Flood Control Act to control the Interior Secretary's power marketing discretion under the Reclamation Laws, by noting that Flood Control Act power rate structures are subject to regulatory jurisdiction of the FPC, whereas Reclamation Act rates are not. Also, PG&E notes, under the Flood Control Act, the FPC is given standards to apply in regulating rates, whereas under the Reclamation Laws there is no such regulatory agency to oversee power sales; rather the Secretary of the Interior directly is given such standards and guide-lines. The statutory difference in administration of power rate-setting is without significance on the issue of how power should be marketed in the public interest. The rate structure guidelines in both statutes are designed to insure that . the government recoups its investment and covers operating expenses, and in no sense does the presence of the FPC in one scheme give rise to an inference that discretion in formulating power marketing plans is to be greater or lesser in one statute or the other.

is no dearth of Congressional pronouncements that public projects funded by public money should inure to the benefit of the public as a whole to the greatest extent possible.[23] This is clearly the goal of the preference clauses found in a multitude of Congressional acts,[24] including, not insignificantly, that governing power sales from CVP. Public agencies and co-ops were to get first shot at the power generated by federal projects, a concept tracing back to public ownership of water resources and the power flowing therefrom.[25] Finally, as then Secretary Udall stated,[26] as a practical matter, because the Department may often find itself using a single system to market power from many sources, it would seem more convenient to the agency itself to operate under one set of standards, albeit imprecise, in the marketing of public power.

■ For these reasons, the court holds that the standards for power marketing set forth in Section 5 of the Flood Control Act of 1944—that the Secretary must dispose of power "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles"—were intended to apply to the marketing of CVP power, and since such standards exist, there is law to apply regarding the allocation scheme here challenged. Thus, the court is not barred from judicially reviewing the allocation scheme by the provisions of 5 U.S.C. § 701(a)(2).

### (b) Congressional Approval of Power Marketing Scheme.

Defendants' next line of defense which, if established, would bar judicial review of the Secretary's exercise of discretion, is that the specific marketing program at issue here, including its discriminatory impact on Santa Clara and others, received Congressional imprimatur by virtue of the enactment of various appropriations bills implementing construction of the Pacific power intertie.[27]

The Department of the Interior in mid-1964 submitted to the House and Senate Appropriations Committees a report [28] regarding negotiations with non-federal entities for construction of extra-high-voltage intertie lines linking the Pacific Northwest and the Pacific Southwest. The focus of the Report was upon the advisability of including non-federal entities in the intertie construction program, the various proposals received from the twelve utilities for intertie construction and the criteria used by the Department in evaluating them, the benefits to the United States and to preference customers associated with each proposal, and Departmental recommendations for Committee action. After receiving the original Report, California congressmen requested the Department to consider in addition three issues, one of which was the possibility of providing "for increases in Federal service to CVP preference agencies

---

**23.** See, e. g. Cong.Rec.—Senate (Nov. 22, 1944) at 8323.

**24.** In addition to the present Reclamation Laws, the Bonneville Power Act, and the Flood Control Act, noted above, preference clauses appeared in the following: Reclamation Act of 1906, 34 Stat. 116; Raker Act of 1913, 38 Stat. 242; Federal Water Power Act of 1920, 41 Stat. 1063, 16 U.S.C. § 800; Salt River Project Act of 1922, 42 Stat. 847, 43 U.S.C. § 598; Boulder Canyon Project Act of 1928, 45 Stat. 1057, 43 U.S.C. § 617d(c); Tennessee Valley Authority Act of 1933, 48 Stat. 58, 16 U.S.C. § 831 et seq.; Rural Electrification Act of 1936, 49 Stat. 1363, 7 U.S.C. § 901 et seq.; Fort Peck Project Act of 1938, 52 Stat. 403, 16 U.S.C. § 833 et seq.

**25.** See *Preference to Public Bodies in the Marketing of Public Power*, Library of Congress, Legislative Reference Service, Jan. 20, 1956.

**26.** See footnote 22, supra.

**27.** See Section 8 of the Pacific Northwest Power Marketing Act, Public Law 88–552, 16 U.S.C. § 837g and Public Works Appropriation Act, 1965, 78 Stat. 682, regarding the construction of the intertie facility.

**28.** The 53-page report, in evidence as Defendants' Exhibit 23, is entitled "Report to the Appropriations Committees of the Congress of the United States Recommending a Plan of Construction and Ownership of EHV Electric Inter-

to provide for their load growth." [29] This request resulted in an amendment to the proposal to increase the CVP bank account.[30]

Defendants maintain that the Report as amended contained provision for limiting sales of non-withdrawable CVP power to those preference agencies then (i. e., in 1964) receiving project power, to the exclusion of preference entities that might request power in the future; that this provision was specifically approved by the Appropriations Committees; and that in enacting appropriations bills recommended by the Committees, Congress in effect ratified the allocation scheme limiting sales of nonwithdrawable power to the 1964 customers.

The court cannot agree. There are weak links in the argument, beginning with the Report and its amendment. The language is at best ambiguous on the specific issue of whether future preference customers could be included in CVP. The amendment, the only operative provision of which was to raise the ceiling on the CVP bank account by a certain estimated amount, states in pertinent part:

> The request of the California Congressmen that the intertie plan be amended to provide load growth for CVP preference customers required that we first establish a reasonable target date. We selected 1980. If load growth could be assured for CVP municipal and cooperative customers until 1980, they would have ample time to make alternative arrangements for additional power supply when they can no longer get all their power from the Central Valley Federal System . .

Having selected 1980 as the target date, the Bureau of Reclamation in cooperation with its CVP customers estimated the amount by which the ceiling on the CVP bank account must be raised to meet interim load growth, and the amount of additional transmission capacity between CVP and the Northwest required to maintain the bank account at this higher level for a 40-year period. The Bureau determined that with anticipated diversity of peak loads between its customers, a system capability of 1,050 megawatts would enable it to serve projected customer loads of 1,080 megawatts in 1980. The 1,080 megawatts is related to load growth of only non-Federal customers now served by the Bureau of Reclamation, excluding SMUD and State agencies. To the extent additional public agencies or co-ops become CVP customers, the Bureau's ability to meet load growth of existing customers might be diminished.

. . . . .

The amended proposal permits carrying preference-customer loads, as indicated earlier, to a total of 1,050 megawatts. The report abounds with references to "preference customers" as a group, and the benefits and cost savings they would receive under the intertie proposal, with absolutely no specific reference to limiting the group to those entities receiving Bureau power in 1964.[31] Then existing agency loads and anticipated needs were used to estimate the amount by which the CVP bank account would need to be increased, and this increase in itself was the vehicle used to provide for load growth, but at no point does the above quoted language unequivocally state that only *those* customers' load growths are to be protected. It is arguable, in fact, that the language can be read to imply that it *was* anticipated that future preference customers would come on the power lines, and that, while an effort was made to protect load growths of exist-

ties Between the Pacific Northwest and the Pacific Southwest" (Committee Print, 1964).

**29.** See Amendatory Letter of July 17, 1964, to the Report, at pages 43–44. In addition the Department was requested to look into assur-

ing Canadian treaty power for California water projects and providing for post-amortization benefits to the federal government and periodic review of certain subtransmission charges.

**30.** See Report at 45.

**31.** See, e. g., Report at 21–22, 34–37, 39.

ing customers, such protection would not be guaranteed.[32]

It cannot be said with sufficient certainty that members of the Committees, if asked, would have agreed that their recommendation of the intertie construction as outlined in the Report amounted to a decision that only the Bureau's 1964 customers would be entitled to non-withdrawable CVP power.

■ This is not, however, the weakest link in the chain. There is no indication in the record, and defendants have certainly not established, that the Committees, having approved the proposals, did anything more than simply recommend to the Congress as a whole that an appropriation to initiate construction of transmission lines be made, "as recommended in the report of the Secretary of the Interior as amended." See S.Rept.No.1326, 88th Cong., 2d Sess. 37–38 (1964) and H.R.Rept.No.1794, 88th Cong., 2d Sess. 42 (1964). Knowledge of the precise course of action alleged to have been acquiesced in is an essential prerequisite to a finding of ratification, cf. *United States v. Beebe,* 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563 (1901); *United States v. Georgia-Pacific Co.,* 421 F.2d 92 (9th Cir. 1970), and the record before the court does not support a finding of congressional knowledge of the exclusion of post-1964 preference customers from receiving non-withdrawable CVP power sufficient to equate passage of the appropriations bills with ratification of the exclusion.[33] See also *Arizona Power Pooling Assn. v. Morton,* supra; *Associated Electric Coop. Inc. v. Morton,* 165 U.S.App. D.C. 344, 507 F.2d 1167 (1974).

Having determined that there are no legal obstacles to review of the Secretary's actions with respect to Santa Clara, and that there is some, albeit imprecise, law to apply in the course of that review, the question remaining is whether those actions were and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The precise question is whether the Secretary has acted consistently with his mandate to dispose of CVP power "in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles." If it is Santa Clara's position that this directive precludes any sort of discrimination among preference customers, it is, of course, not well taken. Nor can Santa Clara legitimately claim an "automatic entitlement" to CVP power simply by virtue of its status as preference customer. *Arizona Power Pooling Assn. v. Morton,* 527 F.2d 721, 730 (9th Cir. 1975). The most that Santa Clara can claim is a reasonable "opportunity to compete" on equal terms with other preference customers for CVP power. *Id.* Rather, the City's argument must be that the Secretary's refusal to offer it CVP power on a non-withdrawable basis is an arbitrary exercise of the substantial discretion inherent in determining what allocations and types of allocations (1) "would encourage the most widespread use" of CVP power, (2) would provide "the lowest possible rates to consumers", and (3) would be "consistent with sound business principles".

■ The Bureau's stated justification for excluding Santa Clara from a non-with-

---

**32.** The amendment states: "To the extent additional public agencies or co-ops *become* CVP customers . . . ." (Emphasis added). Such an interpretation of the Report language would be more consistent with the rest of the Report and with the preference clause of 43 U.S.C. § 485h(c) which says "preference shall be given to municipalities". Reading the Report amendment in the manner proposed by the Bureau and PG&E would border on finding that Congress impliedly repealed 43 U.S.C. § 485h(c) as to sales of CVP power after 1964, merely· by passing the appropriations bills. "Repeals by implication are not favored . .

The intention of the legislature to repeal 'must be clear and manifest.' " *United States v. Borden Co.,* 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Such intention, if it existed here, is anything but "clear and manifest".

**33.** Moreover, the rules of each House of Congress expressly provide that appropriation bills are not to include general legislation. Rule XVI, para. 2, 4, Standing Rules of the Senate, Rules and Manual, United States Senate, 84th Cong. (1955); Rule XXI, par. 2, Rules of the House of Representatives, Rules and Manual, House of Representatives, 84th Cong. (1955).

drawable allocation of CVP power is inadequate. That justification goes no further than merely to assert that only those Bureau customers who were such in 1964 are entitled to non-withdrawable allocations, and those who applied thereafter are not.[34] As the court has previously held, it does not sufficiently appear to have been the intent of Congress to set the 1964 cut-off date, so as to allow the Bureau's allocation scheme to stand on that ground alone.

The court is not prepared at this time, however, to judge whether or not the allocation scheme as a whole, or Santa Clara's treatment thereunder, is arbitrary or irrational or not in compliance with the marketing standards set forth above. Such a decision can be made much more intelligently, if judicial resolution is then necessary, after the Department on remand has had the opportunity to formulate standards and guidelines for the allocation of CVP power, after hearing from interested parties (as required by the court's holding in Part II.D., infra) according to published procedures (as required by the court's holding in Part II.C.(2), infra). Once this is accomplished a detailed record will exist containing all relevant empirical data and facts, competing technical arguments, reasoned analyses of each scheme suggested and, most importantly, specific reasons supporting the eventual choice of one allocation scheme over all others. This procedure allows, in fact insures, that the special expertise of the agency concerned and of other interested groups will be fully brought to bear on this problem of great technical complexity. Only on viewing such a record could the court make a reasoned decision as to whether the plan adopted complies with the law.

The court wishes to stress that no finding is made here as to the legal validity or invalidity of the Bureau's existing scheme for the allocation of CVP power. It is entirely possible that the present scheme fully comports with the statutory mandate, insofar as its effects are concerned. The only finding at this point is that the procedures employed in formulating the allocation plan and the reasons given in support thereof are legally inadequate. See Parts II.C.(2) and II.(D.) infra.

Similarly, the court also declines to consider whether Santa Clara's Fifth Amendment equal protection rights have been violated. The legal test which would be used in such an analysis—whether a rational basis exists for the classification in which Santa Clara finds itself—would require the same sort of inquiry as that needed to decide whether the present allocation plan satisfies the statutory power marketing

---

**34.** It appears that even the stated justification may not have been strictly adhered to by the Bureau. As Santa Clara has repeatedly and heatedly pointed out, there are at least two instances in which the Bureau has provided non-withdrawable allocations for preference entities who were not customers in 1964. ·

As an example, Santa Clara alleges that the City of Biggs received an allocation of long-term, non-withdrawable power a month after Santa Clara's July, 1974 request for an immediate allocation of power, which was granted on a withdrawable basis only. See Plaintiff's Exhibit 10. There is no specific proof in the record regarding the Bureau's treatment of Biggs, except for the fact that Biggs first received CVP power sometime in 1967. See Defendants' Submission of CVP Data, Doc.No. 23 ·(# 294). The Bureau seems to concede the point, for it argues that the allocation to Biggs is justifiable on the grounds of the small size of the allocation (a maximum of 2,440 kilowatts in 1975). The court expresses no viewpoint on the legitimacy or rationality of this justification.

As a further example, the City points to Westlands Water District, which received a long-term allocation of CVP power on December 1, 1966, by contract with the Bureau (in evidence as Plaintiff's Exhibit 23). The contract provided for an immediate contract rate of delivery of only 250 kilowatts, but with provision for the District to take up to 50,000 kilowatts on request, and with further provision for the contract rate of delivery to be set at 50,000 kilowatts as of 1977. The Bureau has extended the reservation date from 1977 to 1980. See Contract Amendment 1, page 2, Plaintiff's Exhibit 23. See also Defendants' Submission of CVP data, Doc.No.23 (# 290) establishing that Westlands first received CVP power in 1966 (117 kilowatts). The defendants have offered no justification for the treatment of Westlands. The court expresses no viewpoint on the rationality of this treatment.

standards. It would be necessary to investigate whether the means chosen (the particular treatment given some preference customers in favor of others) substantially further the legislative goal (the disposition of CVP power in accordance with the standards set forth in the Flood Control Act). Again, such an investigation best awaits the making of a detailed record containing a well-articulated basis for the final allocation scheme chosen, which can then, if a dispute arises, be measured against the demands of equal protection.

## C. *Violation of Administrative Procedure Act, 5 U.S.C. § 551 et seq.*

Santa Clara maintains that the Administrative Procedure Act requires defendants to promulgate rules or regulations, according to established procedures, governing decision making in the realm of dispositions of CVP power. Defendants concede that no such rules have been published or regulations promulgated, but contend that the APA places no such requirements on them to do so.

### (1) *Rule making—Section 553.*

■ If Santa Clara is relying on this provision of the APA, as it seems, then that reliance is misplaced. This section does govern administrative rule making, providing for published notice of hearing inviting interested parties to submit their views, and for agency decision after consideration of such input, but it expressly excepts from its operation matters relating to public property, 5 U.S.C. § 553(a)(2), into which category falls federal hydroelectric power. See, e. g., *Assoc. Elec. Coop. Inc. v. Morton,* 165 U.S. App.D.C. 344, 507 F.2d 1167, 1177–78 (1974); *Northern California Power Agency v. Morton,* 396 F.Supp. 1187, 1191 n. 6 (D.D.C. 1975), aff'd per curiam without written opinion, 539 F.2d 243, No. 75–1572 (D.C. Cir., 1976).

### (2) *Public Information; Agency Rules, Opinions, Orders, Records, and Proceedings—Section 552.*

The APA, 5 U.S.C. § 552(a)(1) requires "each agency" to publish in the *Federal Register* for the guidance of the public:

(B) statements of the general course and method by which its functions are channeled and determined . . .

[and]

(C) rules of procedure . . . .

The Bureau did not publish any such description of the procedures followed in making power allocations to preference customers at any point in time, either initially, or as capacity was added to the Project. The statute clearly provides that no administrative action taken pursuant to unpublished procedures can be allowed to stand against a person adversely affected thereby. 5 U.S.C. § 552(a)(1). *W. G. Cosby Transfer & Storage Co. v. Froehlke,* 480 F.2d 498 (4th Cir. 1973); *Northern California Power Agency v. Morton,* supra, 396 F.Supp. at 1191. The federal defendants seek, however, to invoke the statutory exception which applies when "actual and timely notice" of the terms of the procedures to be followed are given.[35] See *Kessler v. FCC,* 117 U.S.App.D.C. 130, 326 F.2d 673 (1963). The few CVP customers, says the Bureau, are best kept informed of Bureau procedures and anticipated actions through the frequent contacts the Bureau has with each customer, rather than through the medium of the *Federal Register.*

■ This may well be so, but the issue is not whether the Bureau had the opportunity to inform interested parties of procedures to be followed in setting CVP power allocations; rather, the issue is whether the Bureau availed itself of this opportunity. From all that appears on the record, the allocations were made by the Bureau on an *ad hoc* basis more or less unilaterally, without specific opportunity for interested parties to express their views. While Santa

---

**35.** 5 U.S.C. § 552(a)(1) states, in pertinent part: Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

Clara was notified at various times when additional CVP power became available,[36] and was informed that an allocation process would be adopted if applications exceeded available power,[37] no procedures were specified by the Bureau for receiving input regarding how allocations would be made. Santa Clara was merely repeatedly told that its application for an allocation of non-withdrawable power would receive due consideration.[38] In February of 1972, Santa Clara was finally told that the method of allocation was broadly discretionary, that the law does not require all preference customers to be treated on the same basis, and that Santa Clara was at least more fortunate than applicants who had received no power at all.[39] The court holds that it was incumbent on the Bureau reasonably to inform those to be affected by power allocation decisions of the procedures employed in making those decisions. In a case involving the procedures for setting a rate-hike for CVP power, it was said:

> Where "timely" notice of "rules of procedure" is required, the statute cannot be satisfied by actual notice of the Department's improvised decisions as each new problem arises. What is contemplated is a reasonably complete code of procedures set out in advance by which actions can be guided, and strategies planned. This simply was not provided.

*Northern California Power Agency v. Morton,* supra, 396 F.Supp. at 1191. The statutory exemption cannot apply where, as here, such procedures as were followed were incompletely and imprecisely delineated and communicated haphazardly, if at all, to affected parties. As a result of the court's holding here, and in Part II.D. infra, it will be necessary for the Bureau to pub-lish, or disseminate so as to provide actual notice to all interested parties, specific rules of procedure to be followed regarding proceedings to determine the types and amounts of allocations of CVP power among preference customers. See *Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 334 F.2d 570, 578–80 (1964) (Burger, J.); see also *W. G. Cosby Transfer & Storage Corp. v. Froehlke,* 480 F.2d 498, 503 (4th Cir. 1973).

### D. Denial of Due Process.

The absence of standards or guidelines for allocating CVP power among preference customers and the lack of opportunity for interested parties to participate in the process by which the allocation decisions are made, spell out, in Santa Clara's view, a denial of procedural due process.

### (1) Interest Entitled to Protection?

To reach these claims, it must be shown that an invasion of some legally protected right has occurred. *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). At this late date, it cannot be said that a "right" exists to do business with the government. *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). What kind of "property right", if any, does the governing federal statute[40] confer? See *Bishop v. Wood,* —— U.S. ——, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth,* supra, 408 U.S. at 577, 92 S.Ct. 2701. That Santa Clara is a municipality statutorily entitled to "preference" in the sale of CVP power is unavailing, say the defendants; preference customers have no "automatic entitlement" to CVP power.

---

**36.** See Plaintiff's Exhibits 1–7.

**37.** See attachment to Plaintiff's Exhibit 3, entitled "Power Marketing Criteria", Bureau of Reclamation, January 2, 1962, at par. V.

**38.** Plaintiff's Exhibits 9, 11, and 21.

**39.** Plaintiff's Exhibit 22.

**40.** The federal reclamation laws provide the "property right", if such exists. We do not look to the contract entered into by Santa Clara with the Bureau, which admittedly limits Santa Clara's rights to *withdrawable* power, because the issue here is the validity of the procedures used by the Bureau to determine that Santa Clara was to have a contract for withdrawable power only. And it cannot realistically be said that by entering into the contract, which was all the City could get, it waived its right to such procedural due process as the reclamation laws might afford.

*Arizona Power Pooling Assn. v. Morton,* 527 F.2d 721, 730 (9th Cir. 1975). But lacking "automatic entitlement" is not equivalent to lacking any "right" whatsoever in the subject property, federal power. Certainly Congress did not grant to Santa Clara a present ownership interest in CVP power. But this recognition cannot end our inquiry, for property interests protected by procedural due process extend "well beyond" actual ownership of a commodity. *Board of Regents v. Roth,* supra, 408 U.S. at 571–72, 92 S.Ct. 2701.

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source. . . .—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709. Were Santa Clara before us as just another potential customer of Bureau power, unclothed of any Congressional recognition of special privilege in the fight for power, we would have to conclude that the City's interest did indeed go no further than an "abstract need or desire" or "unilateral expectation". But the fact that Congress has seen fit to distinguish municipalities from non-public potential customers of CVP power lends a certain legitimacy to Santa Clara's claim of entitlement.[41] Granted, the "dimensions" of this property interest are statutorily restricted to "preferential" consideration therefor; nevertheless, a restriction on a property right does not eviscerate its status as a right. The preferential treatment Congress has afforded public entities clearly raises the probability that such a customer will receive power over and above that of other customers. The long history of the various laws directing the disposition of public power first to the public, attests to the existence of some claim of entitlement for public agencies.[42] Accordingly, the court holds that a sufficient statutory property interest exists to call forth some degree of due process protection.[43]

### (2) *What Process is Due?*

■ "[T]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Goss v. Lopez,* 419 U.S. 565, 577–78, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). What procedures are required must reflect a careful balance between, on one scale, the nature of the right affected and the consequences to the right-holder of its loss, and on the other, the administrative burden imposed on the agency. *Pence v. Kleppe,* 529 F.2d 135, 142 (9th Cir. 1976), citing *Goldberg v. Kelly,* supra. The objective is to ensure that the agency will acquire the information it should have in a manner fairly calculated to illuminate the issues for reasoned decision making. *Northern California Power Agency v. Morton,* supra, 396 F.Supp. at 1192–93.

■ Procedural due process has a function beyond that of encouraging enlightened, informed administrative decisions. Courts have with increasing frequency rec-

---

**41.** See also *Goldsmith v. Board of Tax Appeals,* 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926).

**42.** See notes 24 and 25 and accompanying text. See also House Report on H.R.7642, 75th Cong., 1st Sess., Rep. No. 1090, at 2–3.

**43.** In *Northern California Power Agency v. Morton,* 396 F.Supp. 1187 (D.D.C.1975), aff'd per curiam without written opinion, 539 F.2d 243, No. 75–1572 (D.C.Cir., 1976), while the Bureau there *conceded* that CVP preference customers have a statutory interest entitled to

some degree of due process protection—and thus the issue was not specifically decided— the court did not question the validity of the concession, and in fact supplied its own citation therefor, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (statutory interest in welfare benefits sufficient to invoke due process protection); *Thompson v. Washington,* 162 U.S.App.D.C. 39, 497 F.2d 626 (1973) (statutory interest in *low-rent* housing sufficient to invoke due process protection against rental increase).

ognized that due process means that administrators must do what they can to structure and confine their discretionary powers through safeguards, standards, principles and rules.

Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion. Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible. Rules and regulations should be freely formulated by administrators, and revised when necessary. Discretionary decisions should more often be supported with findings of fact and reasoned opinions. When administrators provide a framework for principled decision-making, the result will be to diminish the importance of judicial review by enhancing the integrity of the administrative process, and to improve the quality of judicial review in those cases where judicial review is sought.

*Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584, 598 (1971) (Bazelon, C. J.).[44] It is all the more imperative that courts require administrators to articulate the standards that guide their discretion where, in cases such as the one at bar, the court lacks the scientific expertise that would permit meaningful review. If administrators themselves will "provide a framework for principled decision-making", a court can properly confine itself to review of the framework, where it has competence, rather than the merits of the decision, where it is often scientifically unequipped to cope. This is such a case, and such requirements must be imposed here.

■■■ Since the Bureau's present CVP power allocation scheme might well fully comply with the statutory mandate "to dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles",[45] and to sell such power only if to do so would not "impair the efficiency of the project for irrigation purposes" (43 U.S.C. § 485h(c)), procedural due process in this context should not and does not demand that the existing scheme be scrapped immediately and an entirely new scheme be developed. That scheme may be used as a starting point in a sequence of steps that must be taken by the Department and the Bureau to assure that due process is satisfied. These steps are as follows: (1) After re-evaluation of the present scheme in light of the legal conclusions herein expressed, the Department and the Bureau should (a) arrive at a decision, to be considered at that point tentative, as to what the allocation scheme should be (it may in fact be the present scheme if, after

---

**44.** See also *Silva v. Secretary of Labor,* 518 F.2d 301, 311 (1st Cir. 1975); *United States v. Barbera,* 514 F.2d 294, 302–04 (2d Cir. 1975); *Morales v. Schmidt,* 489 F.2d 1335, 1348–49 (7th Cir. 1973) (Stevens, J., dissenting), rehearing en banc, 494 F.2d 85, 87–88 (7th Cir. 1974); *Mobil Oil Corp. v. FPC,* 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973); *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642, 652, n. 22 (1971); *Soglin v. Kauffman,* 418 F.2d 163, 168 (7th Cir. 1968); *Holmes v. New York City Housing Auth.,* 398 F.2d 262, 265 (2d Cir. 1968); *Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 334 F.2d 570, 578 (1964); *Hornsby v. Allen,* 326 F.2d 605, 609–10 (5th Cir. 1964); *Northern California Power Agency v. Morton,* 396 F.Supp. 1187, 1194 (D.V.C.1975); *Harnett v. Board of Zoning, Subdivision and Building Appeals,* 350 F.Supp. 1159, 1161 (D.C.I.1972); *Smith v. Ladner,* 288 F.Supp. 66, 70–71 (S.D. Miss.1968).

Professor Davis is in full accord with this approach, and in fact, is probably its source. See Davis, *Administrative Law Treatise,* 1976 Supp., Sections 2.00 through 2.00–6,6.13, and 1970 Supp., same sections. See also Leventhal, "Principled Fairness and Regulatory Urgency", 25 Case W.R.Law Rev. 66, 70 (1974).

**45.** Since it has been the Department's position that these standards from the Flood Control Act govern its sales of CVP power, see note 22 and accompanying text, supra, if we assume that the Department has exercised its discretion consistently with its stated position, it might even be said to be *likely* that the present scheme reaches the "correct result" as far as the statute is concerned. We hold only that the procedures used to arrive at that "result" were defective as measured against the demands of due process.

due consideration, the Bureau believes it to comply with the statute), and (b) state, in detail sufficient to permit those affected to make a meaningful response, the standards and guidelines used to guide discretion in setting the types and amounts of allocations of CVP power among preference customers, to include (i) the underlying facts, empirical data, and assumptions relied upon, and (ii) detailed rationale for the scheme tentatively chosen, all with an eye toward explaining to all concerned precisely how the chosen scheme fulfills the statutory commands; (2) publish these standards, guidelines, and reasoning, or otherwise give actual notice thereof to all concerned; (3) afford reasonable opportunity for all interested parties to submit written comments on the scheme tentatively chosen; (4) hold a public hearing during which parties may supplement their written comments with on-the-record questioning of Department and Bureau experts and others whose facts, data, or conclusions influenced the choice of the tentative scheme; and (5) after consideration of all input from interested parties, make a final determination of the allocation scheme to be employed, setting forth specific findings with respect to the various comments received and the reasoning which led to the final conclusion. For purposes of later judicial review, if necessary, an identifiable record must be created. Any regulations needed to implement the above requirements should be promulgated. See 43 U.S.C. § 1201.

### (3) *Relief.*

The court believes it would operate against the public interest to strike down the entire allocation scheme under which CVP power is now distributed to preference customers, and, in the exercise of its equitable discretion in fashioning the appropriate relief, declines to do so. Rather, the existing scheme is to remain in full force and effect pending the outcome of the agency's formulation of standards and guidelines for allocation of CVP power and re-evaluation of its present scheme in light of the legal conclusions here expressed and after opportunity for party input as directed above. This procedure allows the agency the chance in the first instance to remedy the due process defects which exist. See Leventhal, "Environmental Decisionmaking and the Role of the Courts", 122 U.Pa.L. Rev. 509, 539 (1974). The consequence of this holding is, of course, that the court declines to declare illegal the withdrawals of power from Santa Clara beginning in 1971, as the City requests, or to order the Bureau to grant Santa Clara a long-term, non-withdrawable allocation of CVP power. As the court has noted, it might be that the Bureau's existing scheme complies in fact with the applicable CVP power distribution standards, notwithstanding that it was devised in the absence of required procedural safeguards, and for the court to upset the status quo at this time would constitute at best a premature, and at worst an unjustified, interruption of CVP power distribution, affecting thousands of consumers.

### (4) *PG&E's Counterclaim.*

This disposition requires that PG&E's motion for summary judgment on its counterclaim against Santa Clara be denied. PG&E's claim against the City arises out of a contract executed in March, 1969, whereunder PG&E would supply the City's excess power requirements at wholesale rates at such times as Santa Clara's share of CVP power, as set by the Bureau, did not meet the City's total requirements.[46] As the Bureau began withdrawing power from Santa Clara in mid-1971, the share of the City's total requirements which had to be supplied by PG&E increased, and the utility billed the City for the difference.[47] Rather than remitting the amounts due, Santa Clara deposited them in escrow every month upon receiving PG&E's bill, pursuant to an arrangement with the utility undertaken so as to preserve any rights the City might

---

**46.** See Exhibit I to PG&E's Motion for Summary Judgment, Doc.No.49.

**47.** See Attachment to Santa Clara's Motion for Summary Judgment on the Due Process Issues, Doc.No.39.

have against the federal government.[48] It was the City's position throughout, of course, that the Bureau's stated power withdrawals were illegal and therefore without effect, that the power received by the City to meet its total requirements was thus, in fact, CVP power, coming in over PG&E transmission lines, and that the money in the escrow fund was not owing to PG&E but rather to the federal government,[49] since it was federal power Santa Clara had been purchasing the whole time.

Given the court's holding, the funds will have to remain in escrow until such time as the Bureau determines, under the procedures prescribed above (Part II.D.(2) ), what Santa Clara's allocation during the withdrawal period *would* have been had it been determined in accordance with the requirements of due process. If the existing scheme survives, PG&E will be entitled to the fund. On the other hand, if a different allocation scheme is adopted, it will be necessary to adjust the parties' rights to the fund in accordance with that scheme.[50]

E. *Violation of National Environmental Policy Act.*

 Santa Clara finally alleges that defendants' actions in (1) withdrawing CVP power from the City, beginning in 1971, and (2) determining not to grant the City a long-term, non-withdrawable allocation of CVP power, are within the category of government actions for which an environmental impact statement (EIS) is required by NEPA, specifically Section 102(2)(C) thereof, 42 U.S.C. § 4332(2)(C), and that no such statement has been prepared. This section provides, in part:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall * * * (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The City contends that the government's action in withdrawing power and in refusing to grant a long-term allocation are "major federal actions" which "significantly affect the quality of the human environment" in that if Santa Clara cannot get low-cost CVP power, it will have to install its own generating facilities or seek power from other suppliers with finite generating resources, either of which will adversely affect the environment, and further that the loss of low-cost federal power will increase power and energy rates to its customers, leaving "diminished resources for Santa Clara to maintain essential services

---

**48.** See Exhibit II to PG&E's Motion for Summary Judgment, Doc.No.49.

**49.** In actuality, according to Santa Clara's argument, only part of the escrow fund would be owing to the Bureau, since amounts deposited were at PG&E's rates for power, whereas CVP power was substantially less expensive. Were Santa Clara to prevail in its argument that the Bureau's withdrawals were illegal, the City would receive the amount left in the fund after paying off the Bureau, since PG&E would have supplied no power.

**50.** This will necessitate an estimate, under the newly-adopted scheme, of what amount of power Santa Clara would have been receiving from CVP in mid-1971 and subsequent months. Assuming that under any scheme adopted which differs from the present one, Santa Clara would have received more power in 1971 and thereafter than it did under the existing scheme, then PG&E's share of the fund will be reduced and will be the power rate charged for the City's total requirements minus the CVP power which *would have been received* had the new plan been in effect, rather than the total fund amount as it now stands.

and a pleasing and healthful cultural and physical environment within which to work and prosper". Defendants see NEPA inapplicable as a matter of law.

Ours is a task of construing the statutory language. For the reasons set forth below, the court is of the opinion that the government's actions here were not "major federal actions significantly affecting the quality of the human environment". Hence NEPA, and its requirement of an EIS, are not applicable to the Bureau's actions.

■ The federal action here consisted of adopting a plan to disseminate limited low-cost federal power, which plan did not leave Santa Clara with as much power as it wanted, or as much as some other municipalities received. The responsible officials decided that their actions in providing only partially for Santa Clara's total power needs fell without the purview of NEPA. Under the law this decision is to be measured against a standard of reasonableness. *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir. 1973).[51]

It cannot be denied that if Santa Clara's power needs are not satisfied by the federal government, the City will have to look elsewhere for power if it intends to continue serving its citizens. Much the same can be said of every city in the United States. It is equally undeniable that as more and more power is needed by the nation, generating facilities of some type, be they nuclear, thermal, or hydroelectric, will have to be constructed, and the presence of such installations will undoubtedly significantly affect the environment. What is not so clear, however, is that the government's allocating a finite quantity of power to one city or a group of cities, instead of to another, significantly affects the quality of the human environment, within the intendment of the NEPA provisions. This is not a case where a power plant is proposed for construction, or even a case where it is proposed to increase the capacity of an existing plant. Nothing was built, dammed, re-routed, or torn down. Electric power was simply ordered sent through some existing power lines and not others.

The effect of the government's not supplying Santa Clara with its full power needs will be felt by the environment in some manner. That cannot be disputed. Assume the worst of several possibilities: that Santa Clara presently undertakes to build a power plant. Such an action, were it federal, would require an EIS. But the government's "non-action" in not supplying power to the City is not tantamount to building a power plant. Can it realistically be said that an EIS is required every time the federal government decides *not* to build a nuclear power plant at a certain location? Surely the intendment of Congress in enacting NEPA was precisely the opposite. NEPA was designed to force decision-makers to consider the environmental impact every time an environment-changing decision is made. The governmental decision here did not and does not change the environment any more than it would change without the government action.

[I]n deciding whether a major federal action will "significantly" affect the quality of the human environment, the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in *excess* of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to

---

51. Use of this standard will give plaintiff the benefit of the doubt as to what the law really is. Views of courts as to the standard of review of this threshold determination have varied widely. See, e. g., *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972) ("arbitrary, capricious"); *Scherr v. Volpe,* 336 F.Supp. 886 (W.D.Wis.1971), aff'd, 466 F.2d 1027 (7th Cir. 1972) (de novo review); *Goose Hollow Foothills League v. Romney,* 334 F.Supp. 877 (D.Or. 1971) (arbitrary, capricious); *Echo Park Residents Comm. v. Romney,* 2 Env.L.Rep. 20337 (C.D.Cal.1971) (arbitrary).

existing adverse conditions or uses in the affected area.

*Hanly v. Kleindienst,* 471 F.2d 823, 830–31 (2d Cir. 1972) (emphasis added). Since the demand for CVP power exceeds the available supply, if the full demand must be met, which it apparently must, then the steps taken to meet that demand might well affect the environment. But those steps are not being taken here by the federal government. *Its* actions in giving out what power it has available do not affect the environment; what affects the environment is that more power than the federal government has is needed, and will have to be sought by others. *Those* actions may affect the environment, but they are not the subject of this complaint. The court holds that there has been no violation of NEPA.

### III. *Conclusion.*

For the foregoing reasons, defendants' motion for summary judgment on the due process issues, plaintiff's motion for summary judgment on the due process issues, and PG&E's motion for summary judgment on its counterclaim must all be denied. Defendants' motion for summary judgment on the NEPA issue is granted.

In addition, given the nature of the disposition of this case, remanding the power allocation scheme issue to the Department of the Interior, the court at this time dismisses the action in its entirety (with exception of the NEPA issue) without prejudice, in the expectation that once the Department complies with the procedural safeguards prescribed above, continued controversy may well not exist.