984 F.2d 1008
 Util. L. Rep. P 13,926
CITY OF SANTA CLARA, Plaintiff-Appellee,
Cities of Palo Alto, Redding, Roseville, Biggs, and Gridley;
Plumas-Sierra Rural Electric Cooperative; and
Shasta Dam Area Public Utility District,
Plaintiffs-Intervenors-Appellees,
v.
James D. WATKINS, Secretary of Energy; United States
Department of Energy, Western Area Power Administration;
and William Clagett, Administrator of the Western Area Power
Administration, Defendants-Appellants,
Arvin-Edison Water Storage District; Banta-Carbona
Irrigation District; Byron-Bethany Irrigation District;
Glenn-Colusa Irrigation District; James Irrigation
District; San Luis Obispo Water District; West Side
Irrigation District; West Stanislaus Irrigation District;
Trinity County Public Utilities District; Hayfork Valley
Public Utility District; Calaveras Public Power Agency;
Tuolumne County Public Power Agency; Bureau of Electricity
of the City of Alameda; and the Cities of Lodi, Lompoc,
Ukiah and Healdsburg, Defendants-Intervenors-Appellants.
 No. 91-15168.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 16, 1992.
Decided Jan. 28, 1993.
 
 Margot de Ferranti (argued) and C. Max Vassanelli, U.S. Dept. of Justice, Washington, DC, for defendants-appellants.
 Dian M. Grueneich, Grueneich, Ellison & Schneider, San Francisco, CA, for defendants-intervenors-appellants First Preference Customers.
 Michael N. McCarty (argued) and Daniel C. Kaufman, Ritts, Brickfield & Kaufman, Washington, DC, for defendants-intervenors-appellants Irrigation Districts.
 Robert A. O'Neil and John Michael Adragna, Miller, Balis & O'Neil, P.C., Washington, DC, for defendants-intervenors-appellants Five Cities.
 Barry F. McCarthy, Duncan, Weinberg & Miller, Santa Clara, CA, for plaintiff-appellee.
 Reuben Goldberg, Goldberg, Fieldman & Letham, Washington, DC, for plaintiffs-intervenors-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before: FLETCHER, POOLE, and BRUNETTI, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Appellants-defendants and appellants-intervenors-defendants (this court previously held them to have a right to intervene as parties affected by the settlement) appeal the district court's order interpreting a settlement agreement between appellees-plaintiffs and appellants-defendants. At issue is a term in the settlement agreement that the parties neglected to define. The elusive term is "nonwithdrawable" as applied to hydroelectric power allocated to municipalities in northern California. Appellants[1] contend that "nonwithdrawable" is a term of art that incorporates three exceptions. Appellees[2] and the district court interpret the word to mean "not withdrawable for any reason." Our review of the contract, the extrinsic evidence presented to the district court and the statutory and contractual context of the negotiations lead us to REVERSE.
 
 FACTS
 
 2
 This litigation concerns the allocation of hydroelectric power from a federal reclamation project. Details of the dispute as it developed from the early 1960's until 1978 are set forth in prior published opinions. See City of Santa Clara v. Kleppe, 418 F.Supp. 1243 (N.D.Cal.1976), rev'd and remanded, City of Santa Clara v. Andrus, 572 F.2d 660, 668 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). We summarize that history here.
 
 
 3
 The Central Valley Project (CVP) is a multipurpose federal reclamation project consisting of dams, hydroelectric power plants, transmission lines, and irrigation canals. CVP's primary purpose is irrigation. However, the Reclamation Act of 1939 permits power generated beyond the needs of CVP to be sold or leased. Because CVP power is much less expensive than power purchased from private utilities, customers in Northern California compete vigorously for it. Western is the agency of the Department of Energy that oversees CVP and markets its power.
 
 
 4
 CVP expanded its generating capacity in the early 1960's, and made contracts to sell the power to numerous customers, including Shasta and Cities. The city of Santa Clara was not among the customers. When it tried to contract for power in 1965, it was informed that all anticipated power was committed to other customers. However, CVP did agree to sell some power to Santa Clara on a "withdrawable" basis. The amount of withdrawable power allocated to Santa Clara grew throughout the late 1960's, and the first withdrawals began in the 1970's.
 
 
 5
 Santa Clara brought suit in federal court, alleging (among other things) that by allocating "nonwithdrawable power" to some customers but not to Santa Clara, the Secretary violated the statutory command that in sales of CVP power "preference shall be given to municipalities and other public corporations or agencies" and REA cooperatives, 43 U.S.C. § 485h(c). City of Santa Clara v. Kleppe, 418 F.Supp. 1243 (N.D.Cal.1976). On appeal, we held that the Secretary had unreviewable discretion to determine how allocations among preference customers were made. City of Santa Clara v. Andrus, 572 F.2d 660, 668 (9th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978). We also held, however, that the Secretary could not continue its practice of selling CVP power to PG & E, a non-preference customer, if a preference customer was willing and able to purchase it. The case was remanded for determination as to whether Santa Clara was willing and able to buy power allotted to PG & E. Id. at 672. Both opinions used the terms "withdrawable" and "nonwithdrawable" but did not discuss whether the latter entailed the exceptions at issue in this case. See Kleppe, 418 F.Supp. at 1248 n. 14, 1255, 1259 n. 40, 1262; Andrus, 572 F.2d at 663-65, 668.
 
 
 6
 Extended settlement negotiations followed this court's remand of Andrus, and resulted in a Memorandum of Understanding (MOU) dated February 8, 1980. The MOU allocates 472.6 MW of CVP power among the customers that were parties to the Andrus suit. It is liberally sprinkled with the terms "withdrawable," "nonwithdrawable," "nonwithdrawable customers," "withdrawable power," and the like. Santa Clara, for example, has the right under the MOU to purchase 65 MW of CVP power "on a nonwithdrawable basis" and an additional 60 MW "on a withdrawable basis." MOU p 6-7. Nowhere are these terms defined. The parties signed a Mutual Release of claims on August 29, 1980 that expressly incorporated the MOU. The district court approved the settlement and dismissed the lawsuit in an order dated October 3, 1980, but retained jurisdiction for the purpose of entering orders necessary to enforce compliance.
 
 
 7
 The MOU was not itself a contract for the sale of power; it was a contract to enter into such contracts. See MOU p 24 ("The parties hereto agree to execute those new contracts and amendments to the contracts between any of them which are necessary to implement the commitments contained herein"). The current problem arose when Western sent contracts to individual customers to implement the commitments made in the MOU. The tendered contracts contained provisions allowing Western to withdraw power from its customers on a pro rata basis if necessary to satisfy the power demands of what the parties refer to as "the three stated purposes." Each of the three stated purposes has a statutory or contractual basis:
 
 
 8
 (1) "Project use" requirements of the CVP, i.e., the power CVP needs to operate its pumping, lighting, maintenance and other operations. Under CVP's enabling statute, the Reclamation Project Act of 1939, no contract for sale of power "shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes." 43 U.S.C. § 485h(c). Only the surplus is available for sale.
 
 
 9
 (2) "First preference" customers in Trinity, Calaveras, and Tuolumne Counties, the sites of two of CVP's dams. The statutes authorizing the construction of the Trinity River and New Melones projects require that Western devote up to 25% of the power from those projects to the "first preference" of certain customers in the counties where those projects are located. 69 Stat. 719 (Act of August 12, 1955); 76 Stat. 1173 (Act of October 23, 1962). Public utilities in Trinity, Calaveras and Tuolumne Counties (the "First Preference Customers") are the beneficiaries of this stated purpose.
 
 
 10
 (3) "Load level protection" that caps deliveries of CVP power at a maximum of 1050 MW. Hydroelectric plants are subject to dips in production. In order to maintain regular output, they require "firming energy" from an outside source. In 1967, PG & E entered into a long-standing contract ("Contract 2948A") to provide Western with up to 1050 MW of firming energy, an expansion from the previous 550 MW. Western's existing contracts with Cities were amended in 1967 to take advantage of the increased capacity.
 
 
 11
 When the MOU was drafted, the parties considered the possibility of withdrawals for the three stated purposes to be "scant" (to the extent they thought about it at all). Findings at 13. To date, there have never been withdrawals for the three stated purposes. No one knows for certain if withdrawals ever will be necessary, or how extensive they might be. Appellees nonetheless object to the withdrawal provisions in the tendered contracts. They argue that their allocations of power under the MOU are not withdrawable for any reason. If it becomes necessary to withdraw allocations of power, Appellees contend, the burden should fall exclusively on those customers that have not contracted for "nonwithdrawable" power. These customers include Appellants Irrigation Districts and the Five Cities.
 
 
 12
 Appellees applied to the district court for enforcement of the MOU requiring tender of contracts incorporating their interpretation of "nonwithdrawable." The district court issued an order in their favor, holding that the word "nonwithdrawable" as used in the MOU contained no exceptions for the three stated purposes. City of Santa Clara v. Herrington, No. C-75-1574 SC (N.D.Cal. October 11, 1985). Arvin-Edison Water Storage District appealed to this court, complaining that it (along with the other Irrigation Districts, the Five Cities and any other preference customers that were not parties to the MOU) should have been allowed to intervene as affected parties. This court agreed, and remanded the case with instructions to permit intervention and to admit additional extrinsic evidence as to the meaning of the MOU. Santa Clara v. Herrington, 811 F.2d 1507 (9th Cir.1987) ("Remand Order ").
 
 
 13
 The district court held a four-day evidentiary hearing in July 1990. It held once again that the term "nonwithdrawable" as used in the MOU meant "not withdrawable for any purpose." Santa Clara v. Watkins, No. C-75-1574 SC (N.D.Cal. August 20, 1990) ("Findings"). This order is the subject of this appeal.
 
 JURISDICTION
 
 14
 This court has jurisdiction over the district court's final order pursuant to 28 U.S.C. § 1291.
 
 STANDARD OF REVIEW
 
 15
 The interpretation of contracts under California law involves a complex interplay of questions of fact and questions of law. The trial court must first decide whether the contested terms are ambiguous.
 
 
 16
 Under California law, the determination of whether a written contract is ambiguous is a question of law that must be decided by the court. Even if the written agreement is clear and unambiguous on its face, the trial judge must receive relevant extrinsic evidence that can prove a meaning to which the language of the contract is "reasonably susceptible." If the court finds after considering this preliminary evidence that the language of the contract is not reasonably susceptible of interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract. The case may then be disposed of by summary judgment[,] because interpretation of the unambiguous contract is solely a question of law.
 
 
 17
 Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 871-72 (9th Cir.) (citations omitted), cert. denied, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).
 
 
 18
 On appeal to this court, the district court's "findings of fact themselves are reviewed under the clearly erroneous standard, but the principles of contract law applied to those facts are reviewed de novo." L.K. Comstock & Co. v. United Engineers & Constructors, Inc., 880 F.2d 219, 221 (9th Cir.1989). See also Southland Corp. v. Emerald Oil Co., 789 F.2d 1441, 1443 (9th Cir.1986) ("Under California law, the interpretation of a written contract is a matter of law for the court even though questions of fact are involved").
 
 DISCUSSION
 
 19
 A. Is the MOU ambiguous?
 
 
 20
 The district court examined extrinsic evidence as required by Brobeck and directed by this court in Remand Order. It concluded that the meaning of "nonwithdrawable" was "clear and unequivocal," and rejected the possibility that it was ambiguous. Findings at 16. This conclusion of law was erroneous.
 
 
 21
 The MOU nowhere defines its terms. It includes a number of references that can be understood only by going outside the four corners of the document: "load growth", "maximum simultaneous demand", "contract rate of delivery" and so on. The frequency with which "nonwithdrawable" appears, and particularly in its repeated use in the phrase "present nonwithdrawable customers", suggests that it also may have a specialized meaning unique to the MOU.
 
 
 22
 More important, however, is the fact that "nonwithdrawable" is "reasonably susceptible of interpretation" in either direction. Since, as Western argues, the three stated purposes represent the limits of its legal ability to sell power, one reasonably would expect the MOU to accommodate this reality. Nothing in the language of the MOU requires that "nonwithdrawability" be free of any and all exceptions. On the other hand, nothing in the language of the MOU requires that the three stated purposes be included. Under Appellees' interpretation, Western agreed to provide power to the parties to the MOU that would not be withdrawable for any purpose. If withdrawals become necessary in order to fulfill Western's statutory or contractual obligations, Appellees insist that they come from other customers to which Western had made no commitment for absolutely nonwithdrawable power.
 
 
 23
 The MOU is not rendered internally inconsistent by either interpretation of "nonwithdrawable." It is an ambiguous contract as defined by Brobeck: one that is "reasonably susceptible" of conflicting readings.
 
 
 24
 B. What does "nonwithdrawable" mean?
 
 
 25
 We have a starting point in the reported opinions Kleppe and Andrus, which set the stage for the MOU negotiations. The parties agree that in those opinions, the word "nonwithdrawable" was used by the court to distinguish between the types of contracts Santa Clara and Cities had in the late-1960's. Joint Pretrial Statement, CR 463 at 14. In the MOU, "nonwithdrawable" appears to serve the same function: a means of distinguishing the Santa Clara-type contract from a Cities-type contract. (For example, "nonwithdrawable" is often used as an adjective to describe certain customers, as in the phrase "present nonwithdrawable customers.") In short, the MOU appears to be an agreement by Western to sell power to Santa Clara on the same terms it had previously sold power to Cities. The determinative question, therefore, appears to be what Cities' pre-MOU contracts provided.
 
 
 26
 Contracts for sale of CVP power to Cities executed in 1963 contained explicit clauses authorizing withdrawals and reductions. See, e.g. Contract for Electric Service to City of Palo Alto, California, No. 14-06-200-676A, December 4, 1963.[3] Article 9(b) established a mechanism for the withdrawal of power for project use and first preference customers.
 
 
 27
 In order to supply electric energy to preference customers in Trinity County, California, in accordance with the requirements of Reclamation law, [Western] ... may withdraw electric power and energy, provided for hereunder, in an amount up to 25 per centum of the contract rate of delivery. The United States may at the sole discretion of [Western] reduce the contract rate of delivery for firm power hereunder by any amount necessary to supply the Project use requirements....
 
 
 28
 Article 9(c) provided for load level protection:
 
 
 29
 At times the electric energy requirements under this and similar contracts of the United States with other preference customers for the supply of firm power will be in excess of the energy available for firm load from the Central Valley Project power plants.... Anything to the contrary in this contract notwithstanding, the United States shall not be obligated to furnish energy hereunder in amounts which, together with amounts to be furnished under said other preference customer contracts, are in excess of the limitations stipulated in said Contract [for firming energy with PG & E].
 
 
 30
 When Contract 2948A expanded PG & E's commitment to provide firming energy from 550 MW to 1050 MW, Cities' contracts were amended to allow Cities the benefit of the expanded capacity. Amendment to Contract for Electric Service to City of Palo Alto, August 22, 1967. The relevant portions of Article 9 were replaced with the following:
 
 
 31
 [Palo Alto's allotment shall be increased] until the total firm load of all preference customers reaches a simultaneous demand of 1,050 megawatts. In the event, however, that the power or energy available to serve the total firm load of all preference agencies contracting for power and energy is not sufficient, ... if necessary said contract rate of delivery shall be curtailed so as not to exceed a prorata share of the total power and energy that is available. The total power and energy available to serve preference agency firm load shall be the power and energy generated at project generating plants that is not required for project operation or for sale under [the first preference statutes].
 
 
 32
 This language is not ambiguous. It is a straightforward recital of the three stated purposes. The first quoted sentence provides for load level protection of 1050 MW, and the third quoted sentence assures that project use and first preference customers receive their statutory priority.[4] The district court erred in finding "the language of the 1967 amendments reasonably subject to both interpretations." Findings at 8. There is no relevant extrinsic evidence in the record that could alter the meaning of the 1967 amendments.
 
 
 33
 The question remains whether the parties agreed in the course of negotiating the MOU to alter the contents of a typical sales contract. We agree with the district court "that the evidence about the conduct of the parties during the negotiations of the MOU is inconclusive." Findings at 11. The district court's only credibility determination[5] was to reject testimony that representatives of Cities had twice requested "absolutely nonwithdrawable" power and were twice rebuffed by Western. After elimination of this testimony, the only evidence that remains is testimony from Western's witnesses who assumed that "nonwithdrawability" included three exceptions, and from Cities' witness who assumed it did not. The mass of documents made a part of the record are similarly uninformative. In none of the correspondence from Western or Cities did either side explicitly or implicitly accept the other's position. The documents merely reiterate each side's understanding of the contract. Most of the time, the three stated purposes were simply not discussed. Because none of the extrinsic evidence relating to the MOU indicates an agreement by the parties to have post-MOU contracts differ from pre-MOU contracts with regard to the three stated purposes, we conclude that the MOU intended continuity with pre-MOU practice.
 
 
 34
 As did the district court, we reject Cities' contention that Appellants' interpretation denies them all their anticipated benefits from the MOU. Foremost among the benefits received under the MOU is each City's ability to grow into its full allotment at its own pace, without the wasteful race to compete for load growth that characterized the previous arrangement. Findings at 15-16. Under Andrus, Western had complete discretion to sell all of its power to other preference customers, leaving Appellees without any CVP power. The MOU spared the Appellees this unfavorable outcome by granting rights to purchase guaranteed amounts of CVP power, subject only to the same withdrawals for the three stated purposes that characterized all of Western's typical pre-MOU sales contracts.
 
 CONCLUSION
 
 35
 The term "nonwithdrawable" as used in the MOU is ambiguous. The most reasonable interpretation is one that requires contracts for sales of power after the MOU that are consistent with those held by Cities prior to the MOU. This was the meaning of "nonwithdrawable" in the Kleppe and Andrus opinions which spawned the settlement discussions and the MOU. Because all of the pre-MOU contracts contained withdrawal provisions for the three stated purposes, the MOU must have contemplated that post-MOU sales contracts would also contain these provisions, which were necessary to maintain Western's statutory and contractual obligations.
 
 
 36
 While we reverse on the merits, we whole-heartedly agree with the district court when it said, "In the final analysis, this action serves as yet another example of how lack of foresight and poor drafting will beget prolonged and expensive litigation.... It is unfortunate that the parties' neglect resulted in a judge having to determine what the parties intended ten years after the fact." Findings at 17. We now have twelve years and four judges' investment of judicial resources.
 
 
 37
 REVERSED.
 
 
 
 [1]
 Western Area Power Administration ("Western"); Arvin-Edison Water Storage District, Banta-Carbona Irrigation District, Byron-Bethany Irrigation District, Glenn-Colusa Irrigation District, James Irrigation District, San Luis Obispo Water District, West Side Irrigation District and West Stanislaus Irrigation District (the "Irrigation Districts"); the cities of Alameda, Lodi, Lompoc, Ukiah and Healdsburg (the "Five Cities"); public utilities in Trinity, Calaveras and Tuolumne Counties (the "First Preference Customers"); and the Pacific Gas and Electric Company ("PG & E")
 
 
 [2]
 The city of Santa Clara; the cities of Palo Alto, Roseville, Redding, Biggs, Gridley and the Plumas-Sierra Rural Electrical Cooperative ("Cities"); Shasta Dam Area Public Utility District ("Shasta")
 
 
 [3]
 The parties stipulated that the Palo Alto contract was typical of the 1963 contracts. Joint Pretrial Statement, CR 463 at Tab C
 
 
 [4]
 Appellees argue that "curtailment" to the level of "power available" as used in the 1967 amendments means something different from "withdrawal" as used in the 1963 contracts and the MOU. We disagree. Both "withdrawal" and "curtailment" have the same practical effect: the three stated purposes must be satisfied before sales to preference customers begin. In the event that the three stated purposes require so much power as to make it impossible to supply the full Contract Rate of Delivery, all customers will face pro rata reductions
 
 
 [5]
 Appellees' brief reveals a penchant for labelling as "not credible" any potentially damaging testimony from Western's witnesses. See e.g. Red Brief at 20, 28, 40-41. It should go without saying that the only relevant credibility determinations are those made by the district court, not the parties