NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   MT-19-1057-FBH |
| EDRA D. BLIXSETH, | Bk. No.     2:09-bk-60452-TLM |
| Debtor. | Adv. Pro.  2:09-ap-00105-TLM |
| WESTERN CAPITAL PARTNERS, LLC, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| ATIGEO LLC; XPATTERNS LLC; MICHAEL SANDOVAL, | |
| Appellees. | |

Argued and Submitted on November 21, 2019
at Las Vegas, Nevada

Filed – December 16, 2019

Appeal from the United States Bankruptcy Court
for the District of Montana

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Honorable Terry L. Meyers, Bankruptcy Judge, Presiding

———————

Appearances:    Christopher Conant of Hatch Ray Olsen Conant LLC
argued on behalf of appellant Western Capital Partners,
LLC; James Morrison of Baker Hostetler LLP argued on
behalf of appellee Michael Sandoval.

———————

Before: FARIS, BRAND, and HERCHER,[**] Bankruptcy Judges.

## INTRODUCTION

The bankruptcy court concluded that chapter 7[1] debtor Edra D.
Blixseth's assignee, Western Capital Partners, LLC ("WCP"), could not
enforce a contractual guaranty against appellee Michael Sandoval and his
companies because Ms. Blixseth breached her obligations under the
contract. WCP appeals.

We hold that the bankruptcy court did not misconstrue the
agreement and guaranty or clearly err in its factual findings. We AFFIRM.

———————

[**] The Honorable David W. Hercher, U.S. Bankruptcy Judge for the District of
Oregon, sitting by designation.

[1] Unless specified otherwise, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1532.

2

## A.    The three companies: Atigeo, xPatterns, and Opspring

Mr. Sandoval was the founder and CEO of technology company Atigeo LLC. In late 2005, he became friends with Ms. Blixseth, who agreed to invest a total of $18 million in xPatterns LLC and Opspring LLC, which were subsidiaries of Atigeo.[3] Mr. Sandoval was the CEO of the three companies, and Ms. Blixseth was a director of xPatterns and Opspring.

xPatterns made a $5 million loan to Mr. Sandoval. He used the loan proceeds to purchase real property in Kirkland, Washington ("Kirkland Property").

In 2007, Opspring negotiated and received a letter of intent from the United States government that could have produced $100 million of revenue for Opspring. But Opspring ultimately received only $2 million to $2.5 million under that agreement.

## B.    The Letter Agreement

Also in 2007, various disputes arose between Ms. Blixseth and

---

[2] We exercise our discretion to review the bankruptcy court's docket, as appropriate. *See Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 725 n.2 (9th Cir. BAP 2008). We also borrow the factual background from our previous decision, *Western Capital Partners, LLC v. Atigeo LLC (In re Blixseth)*, BAP Nos. MT-11-1574-JuHPa, MT-11-1575-JuHPa, 2012 WL 3234205 (9th Cir. BAP Aug. 9, 2012).

[3] Sometime in or around 2007, Opspring ceased operations and merged into Blxware LLC. For ease of reference, we refer to both entities as "Opspring." Similarly, Atigeo was preceded by Azimyth LLC, but we will refer to both entities as "Atigeo."

Mr. Sandoval, including a dispute over xPatterns' $5 million loan to Mr. Sandoval. To resolve their disputes, they entered into an agreement ("Letter Agreement")[4] in which they agreed that Mr. Sandoval would become the sole owner of xPatterns and Ms. Blixseth would obtain full ownership of Opspring and recover $10 million. More specifically:

• Ms. Blixseth's $10 million investment in xPatterns was to be "redeemed" by: (1) a $2 million payment due within 120 days and (2) an $8 million unsecured note payable by xPatterns over three years.

• Mr. Sandoval agreed to guarantee the first $5 million of xPatterns' obligation (the "Guaranty"):

> By signing this Letter Agreement, Sandoval guarantees to the Blixseth Family that the first $5 million portion of the xPatterns Obligations will be paid when due, no matter what may happen. This is a continuing guaranty until the final payment in full of all of the first $5 million portion of the xPatterns Obligations.

• Opspring would pay Atigeo a quarterly performance fee ("Performance Fee") of five percent of Opspring's revenue, up to $15 million. Atigeo would pay the first $5 million to Ms. Blixseth to reduce xPatterns' obligation on the promissory note.

• The parties agreed to not disclose the companies' trade secrets and

---

[4] The Letter Agreement also involved people and entities related to Mr. Sandoval and Ms. Blixseth, respectively. For ease of understanding, our references to Mr. Sandoval and Ms. Blixseth encompass these related parties, as well.

confidential information and the Letter Agreement's terms and promised not to disparage each other.

## C. Performance under the Letter Agreement

Mr. Sandoval, on behalf of xPatterns, executed the $8 million promissory note pursuant to the Letter Agreement. The first $2 million due under the Letter Agreement was eventually paid, about a year late, through set-offs and a lump-sum cash payment. xPatterns did not make any further payments to Ms. Blixseth.

Opspring and Ms. Blixseth failed to pay the Performance Fee to Atigeo. Ms. Blixseth induced third parties to breach their confidentiality agreements with Atigeo and to provide Opspring with proprietary information. Further, Ms. Blixseth sued Atigeo and others in Washington state court in connection with the Letter Agreement and the outstanding balance on the promissory note. She publicly disclosed the terms of the Letter Agreement and asserted that Mr. Sandoval made significant misrepresentations, engaged in fraud, and depleted xPatterns' assets.

The state court later dismissed the lawsuit with prejudice because Ms. Blixseth's claims were premature: payment was not yet due under the promissory note.

## D. Ms. Blixseth's bankruptcy case and the adversary proceeding

On March 26, 2009, Ms. Blixseth initiated a chapter 11 case, which was later converted to chapter 7. Atigeo and xPatterns filed an adversary

complaint against Ms. Blixseth, Opspring, and others, alleging that Ms. Blixseth had breached the Letter Agreement.

The chapter 7 trustee filed a counterclaim against the plaintiffs and a third-party complaint against Mr. Sandoval and others. He asserted that Mr. Sandoval wrongfully converted Ms. Blixseth's investment in xPatterns when he borrowed money from xPatterns to purchase the Kirkland Property. He also asserted that Mr. Sandoval misrepresented the technology owned by Atigeo and xPatterns and fraudulently induced Ms. Blixseth to enter into the Letter Agreement. He requested that the court void the Letter Agreement.

WCP moved to intervene in the adversary proceeding. Ms. Blixseth had guaranteed a loan made by WCP to her son and pledged certain personal property, including her rights in the Letter Agreement and the promissory note. WCP foreclosed on its security interest and purchased the contract claims and accounts arising out of the Letter Agreement. The bankruptcy court granted WCP's motion to intervene.

WCP, standing in Ms. Blixseth's shoes as her assignee, filed a third-party complaint against the Atigeo entities. It sought to enforce the Letter Agreement and collect the $8 million due under the promissory note.

In July 2011, the chapter 7 trustee filed a stipulation for declaratory judgment on the first count (repudiation of the Letter Agreement) of the complaint. The trustee acknowledged that Ms. Blixseth and her related

entities had breached the Letter Agreement. He agreed that all of the terms of the Letter Agreement were repudiated.

The chapter 7 trustee had additionally negotiated a settlement with the Atigeo parties regarding the estate's tort claims against them. He filed a motion to approve the settlement.

The court approved the settlement and stipulation, concluding that the Letter Agreement was repudiated such that it was invalid and unenforceable as a matter of law. However, this Panel vacated the orders, agreeing with WCP that the bankruptcy court had deprived it of due process.

The adversary proceeding was delayed due to other pending appeals and WCP's own bankruptcy case. After the Ninth Circuit held in 2017 that the transfer of Ms. Blixseth's interest in the Letter Agreement to WCP was not a fraudulent transfer, the chapter 7 trustee sought to be dismissed from the adversary proceeding. He argued that he had no interest in the litigation following the appeal but that the estate would have rights to commercial tort claims against Mr. Sandoval if Mr. Sandoval, Atigeo, and xPatterns were successful in repudiating the Letter Agreement. The bankruptcy court did not immediately rule on the trustee's motion.

E.   **The trial and decision**

The bankruptcy court held a trial on WCP's third-party complaint in early 2018. Only Mr. Sandoval and a representative of WCP testified live.

7

Ronald Warren, who managed WCP after its reorganization, testified on behalf of WCP. He said that xPatterns' current obligation to Ms. Blixseth exceeded $19 million. He stated that his calculations credited xPatterns $100,000 for the Performance Fee as of March 2009.

Mr. Sandoval testified as to his business relationship with Ms. Blixseth and the creation of the Letter Agreement. He testified that he agreed to the Letter Agreement's terms to "avoid a lot of the conflict . . . so that the companies could continue."

He admitted that the first payment of $2 million was made about a year late. He agreed that xPatterns never paid the additional $8 million due under the promissory note.

Mr. Sandoval testified that the $5 million amount of the Guaranty was not pegged to the $5 million loan he obtained from xPatterns to buy the Kirkland Property. Rather, he stated that it was "mutually arrived at" based on five percent of the anticipated $100 million government contract.

Regarding the "no matter what may happen" language of the Guaranty, Mr. Sandoval testified that he understood the provision to mean that he might be responsible for a portion of the balance of the $5 million Guaranty. However, he balked at the "ludicrous" suggestion that he would agree to pay the Guaranty even if no one else performed their obligations under the Letter Agreement.

He stated that he would not have signed the Letter Agreement

8

without the nondisclosure and nondisparagement provisions. He testified that these terms were critical to the Letter Agreement in order to protect his companies' business relationship with the government. He testified that people connected to Ms. Blixseth and her companies stole source code, contact information, backup hard drives, and other confidential materials.

The bankruptcy court took the matter under submission and entered its written decision and judgment on February 27, 2019.

The court first considered the Guaranty and the "no matter what may happen" language. It stated that the interpretation of the Guaranty turned on the mutual intention of the parties. It held that, based on the language of the Letter Agreement and Mr. Sandoval's testimony regarding his intent, the Guaranty was not an unconditional promise to satisfy the $5 million owed by xPatterns even if Ms. Blixseth breached the Letter Agreement. Rather, based on the language of the Guaranty, "Sandoval guaranteed xPatterns' debt; he did not make an absolute, direct payment obligation to Blixseth. Inherent in the use of a guarantee is the understanding that the underlying obligation is legally enforceable." It held that Mr. Sandoval's "plausible explanation, coupled with the context of the structured payments and mutual obligations of all parties, leads the Court to conclude the parties to the Letter Agreement did not intend the Guarantee to be an absolute, independent commitment to pay $5 million to Blixseth despite any breaches on her part."

The court next concluded that, under California law,[5] the Letter Agreement was a single, indivisible agreement, rather than a single document containing divisible and independent agreements. It held that the language of the Letter Agreement showed that "the parties intended the Letter Agreement to be an entire encompassing and inclusive contract, creating a global settlement of all issues." Additionally, the bankruptcy court credited Mr. Sandoval's trial testimony in which he explained how the various provisions were dependent and interrelated.

Finally, the court held that WCP failed to prove that Ms. Blixseth performed her obligations or was excused from nonperformance. It found that she failed to pay the Performance Fee, even though Opspring received at least $2 million under the government contract. WCP's proposed credit for the unpaid $100,000 Performance Fee was ten years late and insufficient to cure the breach. It also held that Ms. Blixseth breached the Letter Agreement by disclosing the terms of the agreement and publicly disparaging Mr. Sandoval during the state court litigation.

The bankruptcy court dismissed the third-party complaint because WCP failed to establish that it could enforce the Guaranty due to Ms. Blixseth's breach of her obligations. WCP timely appealed.

---

[5] The parties agreed that the Letter Agreement was governed by California law.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(c)(2).[6] We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court erred in dismissing WCP's third-party complaint and holding that WCP cannot enforce Mr. Sandoval's $5 million Guarantee.

## STANDARDS OF REVIEW

We review questions of contract interpretation de novo. *See DP Aviation v. Smiths Indus. Aerospace & Def. Sys. Ltd.*, 268 F.3d 829, 836 (9th Cir. 2001) ("We review the interpretation and meaning of contract provisions de novo." (citation omitted)). This includes "the determinations of whether

---

[6] We have an independent obligation to satisfy ourselves that the bankruptcy court had subject matter jurisdiction, even though neither party has raised this issue. *See Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1093 (9th Cir. 2004). At first blush, it is not clear that the bankruptcy court had subject matter jurisdiction. This is a dispute between two creditors that does not turn on bankruptcy law and has no immediately apparent effect on the bankruptcy estate. However, as this Panel noted in the prior appeal, WCP acquired Ms. Blixseth's claims against Mr. Sandoval and his related entities but did not assume her liabilities to the parties. Therefore, the outcome of this proceeding could affect the validity and amount of Mr. Sandoval's claims against Ms. Blixseth's bankruptcy estate. *In re Blixseth*, 2012 WL 3234205, at *12 ("Whether the Letter Agreement is enforceable or unenforceable under Count I is directly related to Edra's potential liability for breach of contract damages as alleged in other Counts in the complaint. . . . In addition, the bankruptcy court's decision on the enforceability of the Letter Agreement was inextricably intertwined with the existence of the estate's tort claims against the Atigeo Parties."). For the same reasons, the bankruptcy court still had subject matter jurisdiction when the case came to trial.

contract language is ambiguous, and whether the written contract is reasonably susceptible of a proffered meaning." *Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002) (internal citations and quotation marks omitted). It also includes whether a contract's obligations are dependent or independent. *See Chevron U.S.A. Inc. v. Sheikhpour*, 469 F. App'x 593, 596 (9th Cir. 2012) (interpreting the language of the contract to determine whether provisions were dependent or independent); *see also Verdier v. Verdier*, 133 Cal. App. 2d 325, 334 (1955) (holding that the determination whether contractual provisions are independent "is wholly one of construction of the agreement.").

"De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014) (citations omitted).

But if the bankruptcy court properly relied on extrinsic evidence to interpret the contract, we review the court's factual findings for clear error. *See Captain Blythers, Inc. v. Thompson (In re Captain Blythers, Inc.)*, 311 B.R. 530, 534 (9th Cir. BAP 2004), *aff'd*, 182 F. App'x 708 (9th Cir. 2006) ("Questions of contract interpretation are subject to de novo review unless extrinsic evidence was introduced on issues such as intent, in which event the pertinent factual findings are reviewed for clear error[.]" (internal citations omitted)).

Whether a contractual breach was material is also a factual question

that we review for clear error. *See Sunstone Behavioral Health, Inc. v. Alameda Cty. Med. Ctr.*, 399 F. App'x 237, 237 (9th Cir. 2010) ("The district court's conclusion that Sunstone's breach was not material, and its careful and thorough analysis of that issue, contain no clear error." (citations omitted)).

Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.)*, 262 F.3d 725, 729 (8th Cir. 2001) (citation omitted). "Review for clear error is 'significantly deferential.'" *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 915 (9th Cir. BAP 2013) (quoting *Baker v. Mereshian (In re Mereshian)*, 200 B.R. 342, 345 (9th Cir. BAP 1996)). If two views of the evidence are possible, the court's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

## DISCUSSION

**A.    The bankruptcy court did not err in finding that Ms. Blixseth's breaches of the Letter Agreement bar WCP from enforcing it.**

WCP argues that the bankruptcy court erred in finding that it could not enforce the Guaranty because Ms. Blixseth breached the Letter Agreement. We disagree.

13

"The elements of a breach of contract action under California law are: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach." *Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1201 (N.D. Cal. 2016) (citing *Buschman v. Anesthesia Bus. Consultants, LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014)).

WCP does not deny that Ms. Blixseth breached her obligations. She disparaged Mr. Sandoval and his companies and disclosed the terms of the Letter Agreement. She also failed to cause Opspring to pay the quarterly Performance Fee to Atigeo.[7]

But this is not the end of the inquiry. Even if the plaintiff has breached the contract, the plaintiff may still enforce the contract in certain circumstances. California law evaluates this issue in two different ways.

One line of cases bars recovery only if the plaintiff's breach was "material." *See Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1289 n.12 (9th Cir. 2009) ("The general rule is that if the breach is a material breach, it may give grounds for the non-breaching party to cancel the contract, but if the breach is a partial breach, the non-breaching party's

---

[7] WCP takes issue with the bankruptcy court's finding that Ms. Blixseth failed to pay the Performance Fee. It contends that it did "pay" the Performance Fee with the $100,000 credit and that the timing of the payment was irrelevant. But the Performance Fee had a specific due date. WCP cites no authority for its position that it can nullify a material breach years after the fact by offering a setoff at trial.

remedy is for damages." (citations omitted)). A material breach occurs where the failure to perform "is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the contract.'" *Aslan v. Sycamore Inv. Co. (In re Aslan)*, 909 F.2d 367, 370 (9th Cir. 1990) (quoting *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051 (1987)). "Whether a partial breach of a contract is material depends on 'the importance or seriousness thereof and the probability of the injured party getting substantial performance.'" *Brown v. Grimes*, 192 Cal. App. 4th 265, 278 (2011) (citations omitted). This line of cases is consistent with the Restatement (Second) of Contracts. *See* Restatement (Second) of Contracts § 237 cmt. b (Am. Law Inst. 1981) ("Where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party.").

The second line of cases asks whether the promises that the plaintiff breached are dependent on or independent of the promises that the plaintiff seeks to enforce against the defendant. The breaching plaintiff can enforce any of the defendant's obligations that are independent of the plaintiff's breached obligations, subject to an offset from any damages the defendant incurred due to the plaintiff's breach; but the plaintiff cannot enforce any of the defendant's promises that are dependent on the

plaintiff's promises. "If the covenants are independent, breach of one does not excuse performance of the other." *Verdier*, 133 Cal. App. 2d at 334 (citation omitted). Whether provisions in an agreement are dependent or independent "is wholly [a question] of construction of the agreement." *Id.* (citation omitted).

California case law does not explain how to choose between the two approaches.[8] In fact, one decision by the California court of appeal applies both approaches without explanation. *Brown* applies the materiality standard, 192 Cal. App. 4th at 277-78, and the independence standard, *id.* at 278-79, without noting that the two standards are different.

One court has reasoned that the two approaches are nearly the same: "One way of determining whether a breach is material is to decide whether the covenant breached was independent or dependent. Breach of an independent covenant is not, as a matter of law, a material breach. By definition, an independent covenant does not go to the essence of a contract." *Flagship W., LLC v. Excel Realty Partners, L.P.*, No. 102-CV-05200 OWW DLB, 2005 WL 4701939, at *4 (E.D. Cal. Sept. 30, 2005), *vacated on other grounds and remanded*, 337 F. App'x 679 (9th Cir. 2009) (citations omitted). But the converse is not necessarily true. "[T]he fact-finder need

---

[8] The problem is compounded because "the precedential value of a California Court of Appeal decision does not extend to another panel within the same appellate district, let alone to another appellate district in California." *Tomkow v. Barton (In re Tomkow)*, 563 B.R. 716, 728 (9th Cir. 2017).

not necessarily answer the question whether the covenant breached is independent in order to decide that the breach was material. California case law has long held that the answer to the materiality question is determinative." *Id.*

Fortunately, we need not decide which of these approaches is correct or applicable to the facts of this case. As the following sections will show, the bankruptcy court's decision was correct under both approaches.

**1.      Ms. Blixseth's breaches were material.**

The bankruptcy court correctly determined that Ms. Blixseth's breaches of the nondisclosure and nondisparagement provisions and the Performance Fee obligation were material.

"Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact." *Brown*, 192 Cal. App. 4th at 277. The bankruptcy court properly accepted extrinsic evidence about the materiality of the breach. *See Schellinger Bros. v. Cotter*, 2 Cal. App. 5th 984, 1002 (2016) ("Whether a breach is material is usually left to the trier of fact 'to determine from all the facts and circumstances shown in evidence.'" (citation omitted)).

Mr. Sandoval testified that these terms were major considerations in the bargained-for Letter Agreement. He explained how the money generated by the Performance Fee was intended to offset the monies due under the Letter Agreement and fund the start-up companies. He also

testified that the confidentiality and nondisparagement provisions were vital to securing new investors and business; he testified that Ms. Blixseth's breach devastated the companies and made it impossible to secure new funding. The court did not err in crediting Mr. Sandoval's testimony and finding that the breaches were material.

WCP argues that there is a legally significant difference between a breach of a material term of a contract, on the one hand, and a material breach of the contract, on the other. This is sophistry. WCP relies on *Superior Motels*, but that case merely stands for the well-accepted proposition that not every breach of a contract is material. 195 Cal. App. 3d at 1051. *Superior Motels* makes no distinction between a "breach of a material term" and a "material breach."

Therefore, the bankruptcy court did not err in finding that Ms. Blixseth materially breached the Letter Agreement.

### 2. Ms. Blixseth's obligations under the Letter Agreement were not independent of the Guaranty.

WCP urges us to follow the second approach. It argues that Ms. Blixseth's obligations under the Letter Agreement were independent of the Guaranty, such that her breaches had no effect on Mr. Sandoval's obligation under the Guaranty. It relies heavily on *Colaco v. Cavotec SA*, 25 Cal. App. 5th 1172 (2018), *reh'g denied* (Aug. 10, 2018), *review denied* (Oct. 24, 2018). In that case, both parties breached their obligations under an asset

purchase agreement. The California court of appeal held that, where the agreement called for performance at different times, the provisions were not dependent. *Id.* at 1183. It also held that, "[w]hen a covenant or promise goes only to a part of the consideration, and a breach thereof may be paid for in damages, it is an independent covenant or promise." *Id.* (citations omitted).

The language of the agreement and the intent of the parties determine whether the provisions are dependent or independent. *See id.* ("Whether specific contractual obligations are independent or dependent is a matter of contract interpretation based on the contract's plain language and the parties' intent"); *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1389 (2004) ("Generally, the parties' intent [regarding severability] is revealed by the nature and character of the agreement . . . . Intent can further be shown by the parties' subsequent acts and conduct." (citations and internal quotation marks omitted)); *Brown*, 192 Cal. App. 4th at 279 ("The determination of whether a promise is an independent covenant, so that breach of that promise by one party does not excuse performance by the other party, is based on the intention of the parties as deduced from the agreement.").

The bankruptcy court properly considered the language of the Letter Agreement and Mr. Sandoval's testimony and found that the parties did not intend that Ms. Blixseth's obligations were independent from

Mr. Sandoval's Guaranty. The context makes this obvious. At the outset, Ms. Blixseth and Mr. Sandoval jointly owned two companies. Under the Letter Agreement, they agreed to rearrange things so each of them would become the sole owner of one of the two companies and Ms. Blixseth would recover her investment in the company allocated to Mr. Sandoval. They also agreed to other terms, such as the confidentiality and nondisparagement provisions, that were needed to protect the value of each company. A "business divorce" such as this one only makes sense if viewed as a single, integrated transaction.

Likewise, nothing in the language of the Letter Agreement indicates that the parties intended that it was actually two or more separate agreements. The bankruptcy court correctly observed that the parties' desire, memorialized in the introduction to the Letter Agreement, for a "reasonable separation" to "resolve[] the issues between us" supports "an entire encompassing and inclusive contract, creating a global settlement of all issues." The court additionally noted that some provisions would be rendered nonsensical if it were to sever certain provisions.[9]

The court also relied on Mr. Sandoval's testimony. This was not error;

---

[9] Contrary to WCP's argument, the severability clause of the Letter Agreement has nothing to do with this issue. It comes into play only if one or more provisions of the agreement is "invalid **and** unenforceable." (Emphasis added.) The bankruptcy court did not hold that any provision of the Letter Agreement was invalid, only that WCP could not enforce it due to Ms. Blixseth's breaches.

extrinsic evidence is admissible to determine whether the parties intended the agreement to contain dependent or independent promises. *See Brown*, 192 Cal. App. 4th at 279 (holding that the trial court properly relied on parol evidence to determine "whether a promise is an independent covenant . . . ."). The court credited his explanation of the reasons for and importance of the various provisions, as well as the parties' intention that the Letter Agreement was a "global resolution of all issues, rather than a series of independent agreements." These findings are not clearly erroneous.

WCP also argues that Mr. Sandoval's payment obligations under the Guaranty were independent of Ms. Blixseth's obligations under the nondisparagement and confidentiality provisions because she was obligated to obey those terms into the indefinite future, while Mr. Sandoval's payments were due on specific dates. But the bankruptcy court did not need to consider the effect of a possible future breach of those provisions: Ms. Blixseth breached the Letter Agreement when she filed the state court action disclosing the Letter Agreement and disparaging Mr. Sandoval in May 2008, before the full amount under the Guaranty was due.

Therefore, the bankruptcy court did not err in holding that the Letter Agreement was a unified contract and that Mr. Sandoval's obligations under the Guaranty were dependent on Ms. Blixseth's performance of the

cited provisions of the Letter Agreement.

**B.      The bankruptcy court correctly interpreted the phrase "no matter what may happen" in Mr. Sandoval's Guaranty.**

The Guaranty provided that Mr. Sandoval guaranteed "that the first $5 million portion of the xPatterns obligations will be paid when due, no matter what may happen." WCP argues that, by virtue of the "no matter what may happen" phrase, Mr. Sandoval was absolutely obligated to pay the $5 million Guaranty to Ms. Blixseth, even if she materially breached the Letter Agreement. We disagree.

WCP argues that the Letter Agreement was unambiguous and that the court therefore erred in receiving Mr. Sandoval's testimony. Under California law, "[i]f contractual language is clear and explicit, it governs." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992) (citing Cal. Civ. Code §§ 1636, 1638); *see also Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 54-55 (1997) ("Although the intent of the parties determines the meaning of the contract, the relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." (citations omitted)). The court only needs to consider extrinsic evidence where there is an ambiguity. *See Crow Winthrop Operating P'ship v. Jamboree LLC (In re Crow Winthrop Operating P'ship)*, 241 F.3d 1121, 1124 (9th Cir. 2001) ("Under California law, if a contract's terms are unambiguous, a court may interpret the contract without recourse to

22

extrinsic evidence." (citing *City of Santa Clara v. Watkins*, 984 F.2d 1008, 1012 (9th Cir. 1993)).

The bankruptcy court correctly held that the phrase "no matter what may happen" had "two arguable interpretations." WCP's argument, that Mr. Sandoval was liable on the Guaranty despite any breach by Ms. Blixseth, is consistent with the literal language of the quoted phrase read in isolation. Mr. Sandoval's argument to the contrary is supported by a reading of the entire Letter Agreement and an understanding of the integrated transactions that it documented.

The court employed a correct analytical process to decide which interpretation was correct. The bankruptcy court properly considered the nature of a guaranty. As the court noted, the Guaranty made Mr. Sandoval liable for a portion of xPatterns' debt. This implies that Mr. Sandoval was liable under the Guaranty only to the extent that xPatterns was liable to Ms. Blixseth. xPattern's debt, and Mr. Sandoval's Guaranty, became unenforceable when Ms. Blixseth committed material breaches of the Letter Agreement. The court discounted WCP's interpretation of the phrase "no matter what may happen," partly because it was inconsistent with the usual meaning of a guaranty. It correctly deduced the meaning of the Guaranty from the language of the Letter Agreement itself.

Moreover, the court correctly considered Mr. Sandoval's testimony. He testified that he would not have entered into the Letter Agreement

23

absent the confidentiality and nondisparagement provisions and that Atigeo and xPatterns were relying on the Performance Fee promised by Ms. Blixseth in order to make the payments that they owed to her and continue business operations. The bankruptcy court properly credited this testimony.

WCP argues that the bankruptcy court found that Mr. Sandoval only agreed to the Guaranty because he thought he would never have to satisfy the debt. It states that the bankruptcy court found that Mr. Sandoval "never intended to actually pay it." WCP then argues that the bankruptcy court improperly substituted Mr. Sandoval's subjective expectation for the Letter Agreement's terms, thereby "exonerating" Mr. Sandoval.

This distorts the bankruptcy court's findings beyond recognition. The bankruptcy court never found that Mr. Sandoval believed that he would never have to actually pay the Guaranty. Rather, it found that he thought the Guaranty would be a backup means to satisfy the debt if "various other clauses in the Letter Agreement did not generate sufficient funds to make the payments, as they were designed." In other words, Mr. Sandoval signed the Guaranty because he expected that Ms. Blixseth would carry out her side of the Letter Agreement, which in turn was crucial to Atigeo's and xPatterns' success and ability to pay Ms. Blixseth. This is not the least bit surprising: few people would sign a guaranty if they did not think that the principal obligor would probably pay the debt. The bankruptcy court's

24

interpretation of the Letter Agreement and the Guaranty was reasonable.

## CONCLUSION

The bankruptcy court did not err in entering judgment in Mr. Sandoval's favor on WCP's third-party complaint. We AFFIRM.